<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **CDK GLOBAL, LLC, as successor-in-interest to ADP DEALER SERVICES, INC.,**<br><br>**Plaintiff,**<br><br>v.<br><br>**TULLEY AUTOMOTIVE GROUP, INC. and JOHN DOE CORPORATIONS 1-5,**<br><br>**Defendants.** | Civ. No. 15-3103 (KM) (JBC)<br><br>**OPINION** |

<u>**MCNULTY, U.S.D.J.**</u>**:**

    This matter arises out of a contract for the lease of equipment and installation of computer software designed to facilitate the day-to-day operations of a car dealership, known as a dealer management system ("DMS"). The plaintiff, CDK Global, LLC ("CDK"), as successor-in-interest to ADP Dealer Services, Inc., is the provider of the DMS products. CDK brought this action against defendant Tulley Automotive Group, Inc. ("Tulley"), an automobile dealership, seeking to recover damages for breach of the parties' contract. In short, CDK alleges that Tulley terminated the agreement early, triggering various provisions in the agreement for acceleration of payments owed and return of the leased equipment. CDK's complaint sounds in breach of contract, replevin and conversion, and it seeks contractual attorney's fees. Tulley has counterclaimed against CDK. Tulley alleges, *inter alia,* that CDK misrepresented the efficacy and suitability of the software, and failed to respond adequately to complaints about the software not working as intended. Tulley's five counterclaims allege fraudulent inducement, rescission, breach of

contract, violation of the New Jersey Consumer Fraud Act, § 56:8-1 et seq., and unjust enrichment.

Now before the Court are the following motions: (1) CDK's motion to dismiss Tulley's Amended Counterclaims for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) (Dkt. No. 27) and (2) CDK's appeal of Magistrate Judge James B. Clark's March 3, 2016 Order (Dkt. No. 75) denying CDK's application to quash 21 non-party subpoenas (Dkt. No. 86). For the reasons set forth below, the motion to dismiss will be for the most part denied, but granted as to Counterclaim Count II (rescission). The appeal of Magistrate Judge Clark's Order will be denied; I endorse Judge Clark's sound and practical approach and affirm his Order.

**BACKGROUND**

CDK is an Illinois company which provides technology solutions for the automotive retail industry. (Amended Answer and Counterclaims, Dkt. No. 22 ("AC") ¶ 16) CDK services over 26,500 auto, truck, motorcycle, marine, recreational vehicle, and heavy equipment dealers around the world. Tulley is an automobile dealership with three locations in Manchester and Nashua, New Hampshire. (*Id.* ¶ 13)

CDK develops and sells dealer management systems ("DMS").[1] Those are computer systems, including hardware and software, designed to help organize and manage the functional operations of automobile and large equipment dealerships. (AC ¶¶ 7, 8) DMS systems are used to manage payroll, inventory, accounting, and other daily functions of dealerships. (*Id.* ¶¶ 8, 10) CDK sells its DMS systems to automobile dealerships, repair facilities, and original equipment manufacturers across multiple industries, including agriculture, construction, marine, powersports, and recreational vehicles. (*Id.* ¶¶ 20, 25)

In December 2011, CDK approached Tulley about a potential sale of DMS products. (*Id.* ¶ 28) At the time, Tulley was using a DMS from a competitor, Arkona, Inc., along with supportive systems from DealerSocket and

---

[1]   Although the term "DMS systems" seems redundant, the parties employ it, and I will as well.

2

FirstLook. (*Id.* ¶ 29) The initial approach failed: the parties could not agree on the price. (*Id.* ¶ 30) CDK, through Jeff Evans, a Competitive Account Specialist, and Patti Krueger, a Solution Consultant, approached Tulley again in April 2013. (*Id.* ¶¶ 31, 32) At a meeting held on May 1, 2013, CDK represented to Tulley that its DMS products could handle all of the functions currently being provided by Arkona, DealerSocket and FirstLook. (*Id.* ¶ 35) CDK told Tulley that its DMS would promote efficiency by reducing the number of steps a given process would take, reduce complexity, and generally save Tulley time and money. (*Id.* ¶ 34) With respect to payroll functions, CDK told Tulley that its DMS system would be able to integrate with Tulley's existing setup. (*Id.* ¶ 38) CDK also assured Tulley that information and data currently stored on the Arkona DMS could be transferred to CDK's DMS. (*Id.* ¶ 39) Tulley relied on CDK's expertise in selecting the appropriate system for its multi-dealer business. (*Id.* ¶ 45)

Tulley executed a Master Services Agreement ("MSA") on June 26, 2013; CDK signed the MSA on August 9, 2013. (*Id.* ¶ 44) Under the terms of the MSA, CDK was obligated to deliver equipment "in good working order" and furnish software and services which would "conform to their respective functional and technical specifications." (*Id.* ¶¶ 47, 48) Tulley paid CDK $5,190.00 on executing the MSA, and thereafter made required periodic payments until May 2015. (*Id.* ¶¶ 49, 50)

In December 2013, CDK delivered the equipment and installed the DMS software. (*Id.* ¶ 51) Tulley alleges that it immediately began having problems with the new DMS system. (*Id.*) For instance, certain data and information had been downloaded incorrectly or not at all, and the new system did not integrate with the prior systems. (*Id.* ¶¶ 52, 53) Accordingly, Tulley employees had to manually input information into the systems, resulting in longer hours rather than an increase in efficiency. (*Id.* ¶¶ 53-55) Additionally, the system would fail to input the correct deal details and would mix details of different deals together. (*Id.* ¶ 56) Employees were forced to spend additional time inputting

data or filling out forms. (*Id.*) Moreover, Tulley, as a multi-dealership operation, required a DMS that could accommodate its three dealerships (a so-called "three-roof" system). (*Id.* ¶ 57) However, Tulley alleges that CDK sold Tulley a "one-roof" system which was unable to meet the demands of Tulley's three dealership operation. (*Id.*)

As a result of these problems, Tulley alleges, it has suffered a drop in customer satisfaction and employee morale. (*Id.* ¶ 58) Tulley's score on the Customer Satisfaction Index fell in the first three months of 2014 and Tulley lost an Excellent rating from BMW. (*Id.* ¶ 76) Some employees quit due to the stress the new system caused and Tulley had to hire additional employees to handle the slower processes. (*Id.* ¶¶ 56, 58, 76) An expert hired by Tulley to assess the CDK DMS system found that Tulley had suffered over $2.8 million in losses in the first half of 2014. (*Id.* ¶ 74)

Tulley alleges that it alerted CDK to the issues, but that CDK failed to correct the deficiencies. (*Id.* ¶ 61) Therefore, in April 2015, Tulley confirmed in writing its intent to terminate the MSA.

CDK filed this action on May 1, 2015. (Dkt. No. 1) On June 25, 2015, Tulley answered the complaint and asserted counterclaims against CDK. (Dkt. No. 16) CDK moved to dismiss the counterclaims on July 16, 2015, but that motion was mooted by Tulley's filing of an Amended Answer and Counterclaims on August 10, 2015. (Dkt. Nos. 20, 22) CDK filed the current motion to dismiss the Amended Counterclaim on September 8, 2015. (Dkt. No. 27) Tulley filed an opposition on October 20, 2015, and CDK replied on November 30, 2015. (Dkt. Nos. 41, 50)

Discovery commenced in September 2015. (Dkt. No. 29) Tulley served subpoenas on 21 non-party automobile manufacturers, seeking the production of documents relating to problems encountered and complaints made by other CDK DMS customers. By letter dated January 12, 2016, CDK moved to quash the 21 subpoenas. (Dkt. No. 66) A telephone conference was held before Magistrate Judge Clark on February 1, 2016. (Dkt. No. 72) Magistrate Judge

Clark denied CDK's motion to quash by letter order dated March 3, 2016 (the "Order"). (Dkt. No. 75) On March 21, 2016, CDK filed an appeal of that Order. (Dkt. No. 86)

## I.   MOTION TO DISMISS TULLEY'S COUNTERCLAIMS

Tulley has asserted amended counterclaims sounding in fraudulent inducement, violation of the NJCFA, rescission, breach of contract, and unjust enrichment. CDK has moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss all of the counts for failure to state a claim.

Rule 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The defendant, as the moving party, bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In deciding a Rule 12(b)(6) motion, a court must take the allegations of the complaint as true and draw reasonable inferences in the light most favorable to the plaintiff. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (traditional "reasonable inferences" principle not undermined by *Twombly, see infra*).

Federal Rule of Civil Procedure 8(a) does not require that a complaint contain detailed factual allegations. Nevertheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, the complaint's factual allegations must be sufficient to raise a plaintiff's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570; *see also Umland v. PLANCO Fin. Serv., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Iqbal*, 556 U.S. at 678.

## A. Fraudulent Inducement (Count I)

Under New Jersey law, a fraudulent inducement claim comprises five elements: (1) a material representation of a presently existing or past fact; (2) made with knowledge of its falsity; (3) with the intention that the other party rely thereon; (4) resulting in reliance by that party; (5) to his detriment. *Metex Mfg. Corp. v. Manson*, 2008 WL 877870, at *4 (D.N.J. Mar. 28, 2008) (citing *Jewish Ctr. of Sussex County v. Whale*, 432 A.2d 521, 524 (N.J. 1981)). CDK does not dispute that Tulley has generally pled those elements; rather, CDK argues that Tulley's fraudulent inducement claim is barred by the MSA's integration clause and by the economic loss doctrine.

### 1. Integration Clause

CDK contends that Tulley's fraudulent inducement claim is barred by an integration clause contained in the MSA. According to CDK, any representations made prior to the execution of the MSA merge into the contract and cannot furnish the basis for an independent tort claim.

In general, where a contract contains an integration clause, the parol evidence rule bars the introduction of evidence of extrinsic negotiations or agreements to supplement or vary its terms. There is an exception, however, for evidence of fraud in the inducement; such evidence is not offered to add or change contract terms but to void the contract altogether. *See Ocean Cape Hotel Corp. v. Masefield Corp.*, 164 A.2d 607, 611 (N.J. Super. Ct. App. Div. 1960) ("[P]arol proof of fraud in the inducement is not considered as either additional or substitutionary but rather as indicating that the instrument is, by reason of the fraud, void or voidable."); *Walid v. Yolanda for Irene Couture, Inc.*, 40 A.3d 85, 94 (N.J. Super. Ct. App. Div. 2012) (noting that "extrinsic evidence to prove fraud in the inducement is a well-recognized exception to the parol evidence rule" where the alleged "misrepresented facts are peculiarly within the misrepresenting party's knowledge"). The alleged fraud, however, must concern a matter not addressed in the agreement; in other words, the subject of the misrepresentation must be extraneous to the agreement. *See Travelodge*

*Hotels, Inc. v. Honeysuckle Enters., Inc.*, 357 F. Supp. 2d 788, 795 (D.N.J. 2005) (citing *Filmlife, Inc. v. Mal "Z" Ena, Inc.*, 598 A.2d 1234, 1236 (N.J. Super. Ct. App. Div. 1991)). Where, by contrast, misrepresentations made during the course of negotiations are addressed by the terms of the contract, the claim becomes one for breach of contract, not fraudulent inducement. In such a case, the integration clause will bar the claim. *RNC Systems, Inc. v. Modern Tech. Grp., Inc.*, 861 F. Supp. 2d 436, 454 (D.N.J. 2012).

Here, the integration clause reads as follows:

> Client acknowledges that it has not been induced to enter into this Agreement by any representation or warranty not set forth in this Agreement. This Agreement contains the entire agreement of the parties with respect to their subject matter and supersedes all existing agreements and all other oral, written or other communications between them concerning their subject matter.

(MSA § 17.A p. 13-14) Tulley alleges that CDK fraudulently induced it to sign the MSA based on misrepresentations that the DMS product would work for Tulley's three-dealership business, would increase efficiency, and would reduce costs. (AC ¶¶ 33-41, 89) Tulley further alleges that CDK knew the DMS would not work as intended for Tulley. CDK knew, for example, that it was giving Tulley a "one-roof" system when Tulley needed a "three-roof" system, and CDK knew of prior customer complaints regarding business disruptions caused by switching to CDK's DMS. (AC ¶¶ 57, 79)

The MSA does not speak specifically to Tulley's particular business needs and how the DMS will work to meet those requirements. *Cf. Montclair State Univ. v. Oracle USA, Inc.*, 2012 WL 3647427, at *10 (D.N.J. Aug. 23, 2012). Instead, the MSA deals primarily with the terms of the lease, installation of software, and CDK's support services for the software and equipment. Accordingly, I find that the alleged misrepresentations concern matters extrinsic to the MSA. Such allegations could support a claim of fraudulent

inducement, as opposed to breach of contract, and therefore would not be barred by the integration clause.[2]

## 2. Economic loss doctrine

CDK also argues that the fraudulent inducement tort claim must be dismissed because, in the context of a contract, the economic loss doctrine bars recovery of losses beyond benefit-of-the bargain damages.

"Under New Jersey law, the economic loss doctrine defines the boundary between the overlapping theories of tort law and contract law by barring the recovery of purely economic loss in tort." *Travelers Indem. Co. v. Dammann & Co., Inc.*, 594 F.3d 238, 244 (3d Cir. 2010). The purpose of the economic loss doctrine "is to strike an equitable balance between countervailing public policies[ ] that exist in tort and contracts law." *Id.* A tort duty protects society's interest in freedom from harm, whereas a contractual duty protects society's interest in the performance of promises. *See Spring Motors Distribs., Inc. v. Ford Motor Co.*, 98 N.J. 555, 566, 489 A.2d 660 (1985).

A tort claim may, however, be asserted alongside a breach of contract claim where the tortious conduct is "extrinsic to the contract between the parties." *Chen v. HD Dimension Corp.*, 2010 WL 4721514, at *8 (D.N.J. Nov. 15, 2010) (citing *Capitalplus Equity, LLC v. Prismatic Dev. Corp.*, 2008 WL 2783339, at *6 (D.N.J. July 16, 2008)). A claim of fraud in the inducement may proceed where the allegations relate to "misrepresentations unrelated to the performance of the contract"—*i.e.*, where the misrepresentations breach a duty "separate and distinct from [contractual] performance." *Id.* at *8-9. A party which falsely states that it intends to honor a promise may "breach[] a separate and extraneous duty not to commit fraud." *Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F. Supp. 2d 557, 564 (D.N.J. 2002). Allegations

---

[2]     CDK also contends that the MSA contains a waiver which bars Tulley's fraudulent inducement claim. In relevant part, the purported waiver reads: "Client waives the right to rely upon any representation or warranty not contained herein." (MSA § 12.D p. 11) Because CDK's arguments as to the applicability of the waiver are substantially the same as those regarding the integration clause, I reject this argument on the same grounds as set forth above.

regarding representations made during negotiation of a contract, which support an inference that the party was fraudulently induced to enter the contract, are "necessarily extraneous to the contract." *G&F Graphic Servs., Inc. v. Graphic Innovators, Inc.*, 18 F. Supp. 3d 583, 593 (D.N.J. 2014) (finding exception to the economic loss doctrine to fraud in the inducement claim); *Bracco Diagnostics, Inc.*, 226 F. Supp. 2d at 563 (noting that New Jersey decisions permitting fraud claims to proceed alongside breach of contract are most often ones involving fraudulent inducement claims based on pre-contractual misrepresentations).

Here, Tulley alleges that, during negotiations, CDK knowingly stated that the DMS would work for Tulley's business when CDK knew that it would not. As discussed above, the MSA is premised on a representation that the software and equipment would, generally speaking, function, but it does not address its suitability for Tulley's dealerships. CDK's alleged misrepresentations, independent of the terms of the contract, could give rise to an independent tort. *Cf. RNC Sys., Inc.* 861 F. Supp. 2d at 452 (dismissing fraudulent inducement claim under the economic loss doctrine because the alleged misrepresentations were "addressed squarely within the language" of the contract).

The motion to dismiss Count I of the Counterclaims is therefore denied.

### B.   Rescission (Count II)

CDK seeks dismissal of Tulley's rescission claim on the grounds that Tulley has failed to set forth a prima facie claim for fraud. I have already held that it does. CDK also urges that rescission is not a cause of action as such, but a remedy.

At least in this context, rescission is best viewed as an equitable remedy "only available in the context of an appropriate substantive equitable claim." *Hoke, Inc. v. Cullinet Software, Inc.*, 1992 WL 106784, at *2 (D.N.J. Apr. 28, 1992). Thus rescission of a contract may be appropriate "where there is either original invalidity, fraud, failure of consideration or a material breach or

default." *Travelodge Hotels, Inc. v. BO-ED Inc.*, 2007 WL 8053668, at *10 (D.N.J. Mar. 19, 2007) (citing 17 Am. Jur. 2d Contracts § 951).

Pled as an independent cause of action, rescission appears to be superfluous. Accordingly, Count II will be dismissed.

### C.      Breach of Contract (Count III)

To establish a breach of contract claim, "a plaintiff has the burden to show that the parties entered into a valid contract, that the defendant failed to perform his obligations under the contract and that the plaintiff sustained damages as a result." *Murphy v. Implicito*, 920 A.2d 678, 689 (N.J. Super. Ct. App. Div. 2007). Neither party disputes that the MSA is a valid contract. Rather, CDK contends that Tulley (1) has failed to allege that CDK breached any provision of the MSA and (2) cannot demonstrate recoverable damages.

The core of Tulley's breach of contract counterclaim is that CDK failed to live up to the terms and warranties of the MSA. CDK treats this Counterclaim as one that its DMS did not integrate with the systems of Tulley's prior vendors; it is, but that is too narrow a reading. Tulley alleges that CDK warranted that the software and services provided under the MSA would "conform to their respective functional and technical specifications" and that the equipment would "be in good working order." (AC ¶ 102; MSA § 12A, B p. 10) The DMS, however, did not work as intended: the Amended Counterclaims are replete with allegations as to how the software failed to function properly. (*See* AC ¶¶ 52-57) Tulley also alleges that CDK agreed to provide support services to keep the software in "good working order" but failed to do so: when alerted to problems, CDK allegedly failed to correct or fix them. (*See* AC ¶¶ 60-61; MSA § 5A p. 4, § 13.A. p. 11 (CDK undertakes to "use reasonable efforts to correct any Services of Software which is not in compliance with the warranties provided under Paragraph 12.A.")) Those allegations sufficiently set forth a breach of the MSA.

CDK also cites provisions of the MSA that limit recoverable damages and exclude recovery for special, direct, incidental or consequential damages. (*See* MSA § 13.E) That contention does not bear on the question of whether this Counterclaim pleads a claim of breach of contract. At a minimum, Tulley has alleged direct damages in the form of the amount paid at the time the MSA was executed and the periodic payments required under the agreement. (AC ¶¶ 49-50, 104)

The motion to dismiss Count III of the Counterclaims (breach of contract) is therefore denied.

### D.    New Jersey Consumer Fraud Act (Count IV)

CDK seeks dismissal of Count IV of Tulley's counterclaim under the New Jersey Consumer Fraud Act ("NJCFA"), primarily because the MSA did not involve goods and services sold to the general public.[3] I disagree.

The NJCFA is designed to "protect consumers who purchase goods or services generally sold to the public at large," in other words, "products and services sold to consumers in the popular sense." *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 514 (3d Cir. 2006) (citing *Marascio v. Campanella*, 689 A.2d 852, 857(N.J. Super. Ct. App. Div. 1997) and *Arc Networks, Inc. v. Gold Phone Card Co.*, 756 A.2d 636, 637 (N.J. Super. Ct. App. Div. 2000)) (internal quotations omitted). The NJCFA is not confined, however, to items on the shelves of retail stores. It has been held to apply, for example, to the sale of merchandise to business end users for use in their operations. *Hundred East Credit Corp. v. Eric Shuster Corp.*, 515 A.2d 246, 249 (N.J. Super. Ct. App. Div. 1986) (finding that "unlawful practices thus can victimize business entities as well as individual customers"); *Dreier Co., Inc. v. Unitronix Corp.*, 527 A.2d 875, 882 (N.J. Super. Ct. App. Div. 1986) (finding sale of custom programmed software to business entity was within scope of NJCFA). "It is the character of the

---

[3]     CDK alleges that the economic loss doctrine applies to the NJCFA claim for the same reasons it applied to the fraudulent inducement claim. I have already held, however, that it does not apply there, so I do not apply it here.

transaction, not the identity of the purchaser, which determines whether the CFA is applicable." *Finderne Mgmt. Co., Inc., v. Barrett*, 955 A.2d 940, 954 (N.J. Super. Ct. App. Div. 2008).

To fall within the scope of the NJCFA, goods and services need not be only those that are purchased by "average consumers"; the statute may also cover merchandise that is "expensive, uncommon, or only suited to the needs of a limited clientele." *Prescription Counter v. Amerisource Bergen Corp.*, 2007 WL 3511301, at *14 (D.N.J. Nov. 14, 2007). If the consumption or use of goods and services occurs in the course of business, the transaction may be covered by the NJCFA. *Id.* (distinguishing merchandise used in the course of business from that which is not, such as items which are purchased for resale, designs, and franchises); *see also Stockroom, Inc. v. Dydacomp Dev. Corp.*, 941 F. Supp. 2d 537, 545 (D.N.J. 2013).

Here, the transaction concerned the lease of computer equipment and the installation of a computer software system. The Counterclaims adequately allege that these goods and services are offered to the public at large and bought or leased by business end users. The DMS equipment and software is used by businesses in furtherance of their daily business transactions. *See Prescription Counter*, 2007 WL 3511301, at *16 ("Prescription Counter used the DataStat software system to track customer information, to communicate and order products directly from its wholesalers, and to access price updates from wholesalers, and therefore, consumed the service."). Tulley did not obtain the DMS equipment and software for, *e.g.,* resale; Tulley was the consumer and user of that merchandise. As alleged, the DMS product was used in all areas of Tulley's day to day operations, including payroll, sales, pricing, inventory, accounting, service, insurance, client files and human resources. (AC ¶¶ 52, 53, 55, 56) Accordingly, I find that the DMS product was allegedly consumed or used during the course of business.

Furthermore, although the software might be "only suited to the needs of a limited clientele," Tulley has alleged that the software is marketed to

thousands of businesses across many industries. Specifically, Tulley alleges that CDK is "the largest global provider of integrated information technology and digital marketing solutions to the automotive retail industry." (AC ¶ 16) CDK has provided these products to over 26,500 auto, truck, motorcycle, marine, recreational vehicle and heavy equipment dealerships across the world. (*Id.* ¶ 17) Tulley also alleges that in addition to serving dealership industries, CDK sells its DMS products to repair facilities and original equipment manufacturers. (*Id.* ¶ 20) CDK's DMS products are offered to the agriculture, construction, marine, powersports and recreational vehicle industries. (*Id.* ¶ 25) These allegations permit an inference that CDK's DMS products are sold to the public at large. [4]

The motion to dismiss is therefore denied as to Count IV of the Counterclaim.

### E.   Unjust Enrichment

Finally, CDK seeks dismissal of the unjust enrichment claim on the grounds that it is not pled in the alternative but is instead premised on a valid and binding contract, which precludes recovery under an unjust enrichment theory.

An unjust enrichment claim is commonly an alternative to a breach of contract claim. *Palmeri v. LG Elects. USA, Inc.,* 2008 WL 2945985, at * 7 (D.N.J.

---

[4]     This case is distinguishable from *Princeton Healthcare System v. Netsmart New York, Inc.,* 29 A.3d 361 (N.J. Super. Ct. App. Div. 2011), on which CDK relies. In that case, the New Jersey court found a contract for the installation of a computer software program to be outside the scope of the NJCFA. That case, however, was presented on a motion for summary judgment, and it rested on many factors not apparent in this case, at least at the pleading stage. In *Princeton Healthcare,* for example, the plaintiff sought proposals for an upgraded computer system, worked for years on a process to evaluate the proposals, and worked with the defendant to create the computer software, and engaged in "lengthy negotiations" over the contractual terms. That process culminated in the design of a "custom-made program to satisfy [plaintiff's] unique needs." *Id.* at 474. Whether such factors exist here cannot be known without the benefit of discovery. *See Stockroom, Inc.,* 941 F. Supp. 2d at 545. For the present, it is sufficiently alleged that this is a product offered to the public.

July 30, 2008). As I have said before, an unjust enrichment claim is a "backstop cause of action that often turns out to be superfluous if, for example, a breach of contract is shown." *Dzielak v. Whirlpool Corp.*, 26 F. Supp. 3d 304, 331 (D.N.J. 2014). That Tulley did not explicitly use the words "in the alternative" is not critical. And at the pleading stage, dismissal of an unjust enrichment claim because it might turn out to be superfluous would be premature. Accordingly, I decline to dismiss the unjust enrichment claim on this ground.

On that understanding, I further find that Tulley has sufficiently stated a claim for unjust enrichment. New Jersey law requires that the party asserting such a claim set forth sufficient facts to show that it conferred a benefit on the other party and that the circumstances are such that to deny recovery would be unjust. *Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 285 (N.J. 1992). Here, Tulley has alleges that it conferred a direct benefit on CDK: the payment made at the time of executing the MSA and the periodic payments thereafter. (AC ¶¶ 49-50, 124) Tulley has also alleged that CDK did not provide good value in return, and has therefore been unjustly enriched. (*Id.* ¶ 125) The elements of a claim have been set forth, and the motion to dismiss will be denied as to this count.

In sum, CDK's motion to dismiss the Amended Counterclaims will be granted as to Count II (Rescission) but denied as to all other counts.


II.    **APPEAL OF JUDGE CLARK'S ORDER OF MARCH 3, 2016**

On March 3, 2016, Magistrate Judge Clark entered an Order denying CDK's motion to quash non-party subpoenas that Tulley served upon 21 automobile manufacturer customers of CDK. Tulley appeals.

   A.    **Standard of Review**

A District Court will reverse a Magistrate Judge's decision on a non-dispositive motion only if it is "clearly erroneous or contrary to law." Fed. R.

Civ. P. 72(a); L. Civ. R. 72.1(c)(1)(A). This Court will determine that a finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948).

This Court has frequently spoken of the discretion granted to the Magistrate Judge in non-dispositive matters. Where the appeal seeks review of a matter within the core competence of the Magistrate Judge, such as a discovery dispute, an abuse of discretion standard is appropriate. *See Cooper Hospital/Univ. Med. Ctr. v. Sullivan*, 183 F.R.D. 119, 127 (D.N.J. 1998); *Deluccia v. City of Paterson*, No. 09-703, 2012 WL 909548, at *1 (D.N.J. March 15, 2012). "This deferential standard is especially appropriate where the Magistrate Judge has managed this case from the outset and developed a thorough knowledge of the proceedings." *Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery*, 177 F.R.D. 205, 214 (D.N.J. 1997)(internal quotations omitted); *see Deluccia*, 2012 WL 909548, at *1 (same). Abuse of discretion review, of course, may get us to much the same place: as a practical matter it incorporates plenary review of legal questions. *See Koon v. United States*, 518 U.S. 81, 100 (1996).

The party filing the appeal has the burden of demonstrating that the magistrate's decision was clearly erroneous or contrary to law, *Exxon Corp. v. Halcon Shipping Co.*, 156 F.R.D. 589, 591 (D.N.J. 1994), and unless that burden is met, the magistrate judge's findings should not be rejected even if the district court could have decided the matter differently. *Toth v. Alice Pearl, Inc.*, 158 F.R.D. 47, 50 (D.N.J. 1994).

### B.   Analysis

CDK's appeal is untimely under Fed. R. Civ. P. 72(a). The rule provides that any objection to a magistrate order must be brought within 14 days of the date of the order. *See* Fed. R. Civ. P. 72(a). Here, the Order is dated March 3, 2016. CDK filed their appeal on March 21, 2016, four days late. CDK has not

acknowledged or offered any excuse for its untimeliness. On that ground alone, the appeal would be denied. At any rate, however, I find that there is no error of law or fact requiring reversal of Magistrate Judge Clark's Order.

CDK first asserts that Magistrate Judge Clark rested his decision only on a relevancy analysis, and failed to apply the proportionality standard of Fed. R. Civ. P. 26(b)(1). Contrary to CDK's contentions, Magistrate Judge Clark applied the correct standard.

Rule 26(b)(1) provides as follows:

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). That proportionality language is designed to "guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of inquiry." Fed. R. Civ. P. 26(b) advisory committee's note (1983 Amendment). The factors set forth in the rule are for the court to use "in reaching a case-specific determination on the appropriate scope of discovery." *Id.* (2015 Amendment).

Magistrate Judge Clark weighed these factors in reaching his determination that the subpoenas were appropriate. Judge Clark found that there was a nexus between the requested information and Tulley's counterclaims. (Order 6-7) The subpoenas were directed at determining whether CDK had a practice or pattern of misrepresenting its Drive System product to other customers, and whether there had been other complaints about the system's functionality. (Order 6–7; Dkt. No. 88-1, Ex. B 7:19-8:7, 9:25-10:10)

Judge Clark also considered and rejected CDK's argument that the discovery is disproportionate because it brought this action as a simple contract case. In CDK's mind, this is a pure "$400,000 collections case," which

should not be complicated by a document dump from other customers. That argument, however, simply wishes away Tulley's counterclaims, which seek millions of dollars in damages. (Order 6–7) And there was no sufficient showing that the requested discovery is unduly voluminous, expensive, or disproportionate to what is at stake.

CDK's substantive arguments themselves tend to focus on relevance. (*See* Br. 13) CDK repeats the argument made before Magistrate Judge Clark that because each of its customers uses a unique version of the Drive programs, the information requested in the subpoenas is "unrelated to the claims in this case." (Br. 10, 12) That argument, however, was considered and rejected by Magistrate Judge Clark; as he explained, the experience of other customers is relevant. (Order 6–7)

CDK next argues that Magistrate Judge Clark failed to consider the burden—especially the burden on CDK, which will have to sift through the discovery produced in response to the subpoenas. In the Order, Judge Clark dealt with this argument, and the related argument that the requested discovery would be unduly burdensome for the non-party recipients of the subpoenas. (Order 7) Judge Clark focused on the burden to non-parties, but found that CDK had no standing to assert that: "any undue burden in *producing* the requested information would be faced by the Automobile Manufacturers *and not by CDK.*" (*Id.*) (emphasis added). That ruling was plainly correct. *See Green v. Cosby*, 2016 WL 1086716, at *7 (E.D. Pa. Mar. 21, 2016) ("Even if a defendant has standing generally to quash a subpoena, he still lacks standing to challenge a third-party subpoena based on undue burden because it is the third-party that faces the burden of production and not the defendant.") (collecting cases).

The burden of *reviewing* the produced discovery is of secondary importance, at best. That burden would fall equally on both parties here. At any rate, CDK has made no factual showing as to the likely extent of the

discovery to be produced; its argument that it will be forced to sift through a mountain of discovery is speculative.

I find that Judge Clark's well-reasoned ruling was supported by the record and well within the scope of the Magistrate Judge's authority. Accordingly, I deny CDK's appeal and affirm Magistrate Judge Clark's order.

**CONCLUSION**

For the reasons stated above, Plaintiff CDK's Motion to Reverse Magistrate Judge Clark's Order is **DENIED** and the Opinion and Order are **AFFIRMED**. Plaintiff CDK's Motion to Dismiss the Amended Counterclaims is **GRANTED** as to Count II, but **DENIED** as to all remaining counts. An appropriate order follows.

KEVIN MCNULTY, U.S.D.J.

Date: April 29, 2016

18