## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **CDK GLOBAL, LLC, as successor-in-interest to ADP DEALER SERVICES, INC.,**<br><br>        **Plaintiff,**<br><br>v.<br><br>**TULLEY AUTOMOTIVE GROUP, INC., and JOHN DOE CORPORATIONS 1-5,**<br><br>        **Defendants.** | Civ. No. 15-3103 (KM) (JBC)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

This matter arises out of the contract to lease certain equipment and installation of computer software, also known as a dealer management system ("DMS"), designed to help car dealerships with their daily operations. The plaintiff, CDK Global, LLC ("CDK"), as successor-in-interest to ADP Dealer Services, Inc., sells DMS products and services associated with the installation, implementation, and maintenance of DMS. CDK sold DMS products and associated services to defendant Tulley Automotive Group, Inc. ("Tulley"), an automobile dealership with locations in New Hampshire. In essence, CDK alleges that Tulley breached the parties' contract when Tulley terminated the agreement early, triggering various contractual provisions, including acceleration of payments owed, liquidated damages, and the return of leased equipment.

CDK filed a complaint against Tulley asserting four causes of action: breach of contract, replevin, contractual attorneys' fees, and conversion. (DE 1.) Tulley answered the complaint and also asserted five counterclaims against CDK: fraudulent inducement, rescission, breach of contract, violation of New

1

Jersey Consumer Fraud Act, § 56:8-1 *et seq.* ("NJCFA"), and unjust enrichment. Earlier in this case, CDK filed a motion to dismiss all of Tulley's counterclaims. (DE 86.) I granted the motion to dismiss as to Tulley's counterclaim for rescission (solely on grounds of superfluity), but otherwise denied it. (*See* DE 103, 104.)

Now before the Court are the following motions: (1) CDK's motion for summary judgment against Tulley's four remaining counterclaims (DE 265); (2) Tulley's motion for summary judgment on CDK's claims (DE 266); and (3) CDK's motion to voluntarily dismiss its own replevin and conversion claims against Tulley pursuant to Fed. R. Civ. P. 41(a)(2). (DE 290.) For the reasons set forth below, I will grant in part and deny in part CDK's motion for summary judgment on Tulley's counterclaims, deny Tulley's motion for summary judgment on CDK's claims, and grant CDK's motion to voluntarily dismiss its replevin and conversion counts.

## I.   Background[1]

CDK provides integrated computerized transaction processing, data communications, and other information services to various industries throughout the United States. (Compl. ¶ 9.) It is incorporated in State of Delaware and has its principal place of business in Illinois. (*Id.* ¶ 1.) CDK sues as the successor-in-interest to ADP Dealer Services, Inc. ("ADPDS"), the entity

---

[1] For ease of reference, certain key items from the record will be abbreviated as follows:

| "Compl" | = | CDK's Complaint [ECF no. 1] |
|---|---|---|
| "AC" | = | Tulley's Amended Answer and Counterclaims [ECF no. 22] |
| "Pl. Ex. ___" | = | Plaintiff CDK's exhibits in connection with their motion for summary judgment [ECF nos. 267-2 – 267-6.] |
| "Def. Ex. ___" | = | Defendant Tulley's exhibits in connection with their motion for summary judgment [ECF nos. 274-1 – 274-26; 276-1 – 276-25; 277-1 – 277-31] |

that actually entered into the contract at issue. (For simplicity, references to CDK will be deemed to include the predecessor ADP entity.)[2]

Tulley is an automobile dealership that sells BMW, Buick, GMC, and Mazda vehicles in Manchester and Nashua, New Hampshire. (AC ¶¶ 1, 13.) Tulley is incorporated and has its principal place of business in New Hampshire.[3] (Compl. ¶ 2.)

One of the products which CDK sells is a dealer management system or DMS called "Drive," which consists of hardware and computer software that supports the daily operations for automobile dealerships, such as payroll, accounting, inventory, and itemizing the costs of deals. (AC ¶¶ 7–8.) CDK sells its DMS system to automobile dealerships, but also to repair facilities and original equipment manufacturers in the agriculture, construction, marine, powersports, and recreational vehicle industries. (AC ¶¶ 20, 25.)

---

[2] The ADP name seems to encompass a number of entities. Unhelpfully, the record contains references to "ADP" which do not always specify which ADP entity is meant. The actual contracting entity, ADPDS, was spun off from the parent ADP entity on October 1, 2014, resulting in the current configuration of CDK, which succeeded to all of the agreements of ADPDS. (Compl. ¶¶ 7–8) ADPDS was a Delaware corporation. (DE 292 at 8) CDK submits an affidavit of the former Assistant General Counsel and VP of ADPDS (he now holds the same position at CDK), which states that the "global headquarters" of ADPDS was located in Illinois in 2012, 2013, and 2014, and that the headquarters of CDK has been at the same location since the spinoff transaction. (Pl. Ex. T, DE 292-3) On the other hand, according to the affidavit of the controller of ADPDS, dated March 18, 2013, submitted in another D.N.J. action regarding a Master Servicing Agreement, ADPDS had its principal place of business in Roseland, New Jersey. (Def. Ex. III ¶ 3 (DE 277-9) (ADP has "its principal place of business in New Jersey.")). ADPDS's application to transact business in the State of Illinois, filed in 2012, states that its principal office is located in New Jersey. (Def. Ex. JJJ (DE 283-10)). *See also* Def. Ex. Ex. YY (DE 276-25) (Correspondence sent to Jane Copeland on behalf of Tulley in 2015 from CDK's regional sales manager in Parsippany, New Jersey); Ex. KKK (DE 277-11) (April 2015 letter threatening litigation sent by CDK's senior counsel in Parsippany)). Here, CDK was perhaps drawing a distinction between its "headquarters" and its "principal place of business." *Cf. Hertz Corp. v. Friend*, 559 U.S. 77, 130 S. Ct. 1181 (2010) (discussion of then-conflicting approaches to corporate citizenship for purposes of diversity jurisdiction). At any rate, it is fairly clear that CDK/ADPDS is and was conducting substantial business activities in New Jersey.

[3] Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a), because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.

CDK first reached out to Tulley in late 2011 for a potential sale of CDK's DMS products. (Pl. Ex. A at 87:1–91:25.) At that time, Tulley was using another DMS system called Dealertrack (also referred to as Arkona throughout the record). (*Id.*) In March 2012, two CDK sales representatives, Stephanie Manzoli and Joseph Zarra, met with Tulley representatives to discuss the possibility of having Tulley switch over to CDK Drive for their DMS software. (Pl. Ex. J at CDK015027–15119.) A month later, Mark Tulley from Tulley Automotive Group informed Stephanie Manzoli that after reviewing CDK's proposal, Tulley would not be moving forward with purchasing Drive due to Drive's installation and continuing monthly fees. (Pl. Ex. K at TULLEY0004460.0003.) Eventually, Mark Tulley stopped responding to Ms. Manzoli's emails.

In April 2013, CDK and Tulley resumed communication regarding the possibility of having Tulley switch to Drive for their DMS system. (Pl. Ex. K at TULLEY0003238.0001–0003238.0002.) The emails between Jeff Evans from CDK and Julie Loud, Tulley's Corporate Controller, emphasized the need for CDK to meet Tulley's operation requirements within Tulley's budget. (*Id.*) On May 1, 2013, Jeff Evans met with various Tulley personnel, including Bryan Tulley, Mark Tulley, and John Murphy, Tulley's Director of Fixed Operations. According to Tulley's counterclaims, Jeff Evans had allegedly made various representations during this meeting that CDK Drive would create more efficiencies for Tulley and could configure a program that would meet Tulley's operating needs. (Def. Ex. K at 8–10; Def. Ex. UUU at 116:17–117:25, 118:3–119:1, Def. Ex. VVV at 61:7–20, 99:2–11.)

As discussions between Tulley and CDK continued, Bryan Tulley obtained the contact information of an individual named Jane Copeland who Tulley believed had knowledge in DMS systems, including CDK's Drive system. (Pl. Ex. M at API000206–207; Pl. Ex. A at 162:162:15–164:11). Tulley, however, did not contact Ms. Copeland to assist them on the transaction between Tulley and CDK prior to entering into their contract with CDK. (Pl. Ex. A at 167:5–10; Pl. Ex. E at 69:22–70:8.)

4

After CDK provided Tulley a copy of their initial proposal, the parties engaged in a series of negotiations. (Pl. Ex B at 98:20–99:9; Pl. Ex. C at 106:7–107:14.) An email from Jeff Evans demonstrates that he reviewed line by line the items of the proposal with Tulley, however, neither Mark nor Bryan Tulley recall having this call with him. (Pl. Ex. J at CDK014980–14981, Pl. Ex B. at 92:6–93:1, Def. Ex. UUU at 139:10–14.) Tulley argues that the only thing they negotiated was the price that Tulley would have to pay for the CDK Drive program, and that they did not engage in discussions regarding the selection of specific software because they relied on CDK's expertise to do so. Regardless of whether Tulley negotiated any of the software included in its DMS system, it seems that Tulley was able to negotiate some of the terms of the Master Services Agreement ("MSA") that the parties eventually executed. For example, Bryan Tulley from Tulley Automotive testified that he negotiated the length of time in one of the MSA addendums signed by the parties. (Pl. Ex. A at 157:4–158:23.) Jane Copeland also testified during her deposition that based on her knowledge, dealerships do have the ability the negotiate the terms of an MSA. (Pl. Ex. E at 87:16–20.)

Eventually, the parties came to an agreement, embodied in the MSA. (Pl. Ex. J at CDK000001–28, DE 267-4.) Tulley signed the MSA, including all schedules and addenda, on June 26, 2013. The MSA states that the parties agree that Tulley would lease software from CDK[4] for a non-cancellable five-year term, and that Tulley would pay both a start up fee and monthly fees to CDK during that term. (*Id.*) The MSA also includes an integration clause, a section limiting CDK's liabilities, a provision that states that there are no express or implied warranties with respect to CDK's services and software, and that Tulley waives the right to rely on any representation or warranty not contained in the Agreement. (*Id.* ¶¶ 12, 13, 17.) The MSA also contains a

---

[4]     Again, for clarity, the actual contracting party was CDK's predecessor, ADP Dealer Services, Inc.

section that provides CDK remedies in the event Tulley defaults on any of its contractual obligations. (*Id.* ¶ 16.)

CDK began installing Drive for Tulley in mid-August 2013. (Pl. Ex. J at CDK012792–12793.) Usually, the training and implementation process for Drive occurs in six steps. (Pl. Ex. J atCDK013021.) The first step is called "Implementation Discovery," which is when CDK personnel meet with a dealership's managers and key stakeholders in order to understand the dealership's specific needs from a DMS system. (*Id.*, Pl. Ex H at 57:8–18.) Tulley acknowledged receiving worksheets in connection with the Implementation Discovery process, which they filled out. The first day a dealership begins using the new DMS software is known as the "go-live date," which is another step in the implementation process. (*Id.*) Prior to the "go-live date," CDK will verify with the client the specifications of the DMS system they installed. (Pl Ex. C at 149:5–10; Pl. Ex. E at 106:13–15.) During this time, a dealership is responsible for ensuring that all their employees complete CDK's Drive training before launching the new DMS system. Mark Tulley testified that he was aware of this requirement. (Pl. Ex. B at 145:14–21.) According to CDK's records, however, Tulley personnel only completed 68% of the Drive training prior to the go-live date. (Pl. Ex. J at CDK007474–7476.) Tulley contends that that percentage does not accurately reflect the amount of training Tulley employees undertook since CDK's training tracker was not accurately reflecting the training progress for some of Tulley's employees. (Def. Ex. AA.)

Tulley's new DMS system went "live" on December 3, 2013. Ms. Copeland testified that it usually takes approximately six months for a dealership to fully adjust to a new DMS system.  (Pl. Ex. E at 70:10–15.) Soon after Drive launched, Tulley began experiencing issues with the system, which they communicated to CDK. In response, CDK began trying to address Tulley's issues through in person meetings and trainings at Tulley and internally at CDK with their own consultants and account managers. (Pl. Ex. J at CDK010577–10583, CDK011531–011532, CDK021732; Pl. Ex. K at TULLEY0003279.0001.) Internally, CDK recognized that one of the problems

6

was that each dealership should have had a separate logon. (Def. Ex. BB at CDK007373.)

Tulley's issues with Drive continued, and on February 17, 2014, Bryan Tulley reached out to Jane Copeland for her advice. (Pl. Ex. K at TULLEY0006044.0001–2.) Tulley began expressing the possibility of no longer continuing with Drive around this time as well. In addition to the myriad of installation issues they faced, Tulley felt that the "[f]unctionality of the system [was] not what they expected and sold" by CDK. (Pl. Ex. J at CDK012269–12270, CDK012274–12278.) Throughout this time, CDK and Tulley were in communication with one another, and CDK personnel were visiting Tulley's dealership locations. (*Id.* at CDK011529–11530.)

However, by April 2014, Tulley ceased communication with CDK and instructed their employees to not respond to any of CDK's phone calls and instead voice their concerns or issues with Drive to their internal manager. (Pl. Ex. K at TULLEY0003013.0001; Pl. Ex. J at CDK008846–8847; Pl. Ex. M at API003734–3735.) Around the same time, Tulley began discussing the possibility of returning to DealerTrack for its DMS system. (Pl. Ex. E at 144:1–11; Pl. Ex. M at API003734–3735.) In a letter from Tulley's attorney to CDK dated April 21, 2014, Tulley delineated all the issues they experienced with Drive. (Pl. Ex. J at CDK017851–17853.) The letter states that it is serving as a

> formal notification that if the complaints as set forth in this letter . . . are not addressed immediately and resolved within thirty (30) days and the ADP system is not made to function without the necessity of purchasing further ADP products . . . [Tulley] intends to terminate the contract for a gross breach of contract, failure to provide services and equipment per the technical and functional specifications and contrary to the representations made by the sales force of ADP . . .

*Id.*

Bryan Tulley subsequently met with CDK on May 7, 2014, and the parties resumed communication with one another in order to address Tulley's issues with Drive. (Pl. Ex. N at TAG0000142.) At that meeting, CDK presented two potential solutions for Tulley: one would give Tulley additional logons to

7

separate out each automobile manufacturer they sell, and the other would be to split Tulley up into a "multi-company environment" where each "company" would have a separate log on. (Pl. Ex. H at 76:10–77:19.) Both solutions would require Tulley to invest more time and effort to reconfigure their current Drive system. (*Id.* at 78:5–80:1; Def. Ex. PP at CDK001932.) Andy Freedman, a Vice President of Business Development at CDK, also testified that CDK told Tulley that reconfiguring Tulley's current Drive system would not cost them any additional money. (Pl. Ex. H at 81:6–22.) Tulley disputes this fact and asserts that CDK never represented to them that the new set of logons would be free or that installing the new logons would not result in additional expense. (Def. Ex. B ¶ 20; Def. Ex. XX ¶¶ 4–5.) Contemporaneous emails demonstrate that CDK discussed *internally* the possibility of offering to reconfigure Tulley's system and provide additional logons at no charge to Tulley. (Def. Ex. WW at CDK010326.)

Ultimately, Tulley did not move forward with either proposal to reconfigure Drive. (Pl. Ex. B at 232:8–22.) John Murphy testified that Tulley never responded to CDK's proposals because Tulley did not want to go through a "complete restart" with the Drive program. (Def. Ex VVV at 176:8–13.)

CDK re-offered the reconfiguration of Tulley's Drive system on January 9, 2015 to Jane Copeland on behalf of Tulley. (Pl. Ex. K at TULLEY0005941.0001–2, TULLEY0005942.0001; Pl. Ex. M at API00019–20.) Ms. Copeland then forwarded the offer to Bryan Tulley and told him that Tulley needed to give CDK an "official response" and explain why each of CDK's offers was unacceptable. (Pl. Ex. M at API00019–20.) Tulley again declined CDK's proposal.

By the end of February 2015, Tulley had decided to return to Dealertrack as their DMS provider. (Pl. Ex. L at Dealertrack00085–00087.) On March 30, John Murphy confirmed with CDK that the GM Retail Inventory Management ("RIM") was to be turned off because Tulley was looking at other DMS service providers. (Pl. Ex. J at CDK014919–14120.) On March 31, 2015, CDK's counsel sent a letter to Tulley and their counsel stating that by turning off GM's RIM

because Tulley was planning to return to Dealertrack constituted a termination of the MSA and a breach of their obligations under the MSA. (Pl. Ex. J at CDK015132.) The letter states that Tulley's actions would accelerate the balance due under the MSA, but that CDK would be willing to accept 70% of that obligation, or $382,428.52. (*Id*.) On April 1, 2015, CDK sent a follow up letter advising Tulley that pursuant to 18 U.S.C. § 1030, unless authorized under the Agreement, Tulley is not authorized to use CDK hardware or software to facilitate the transfer of data "to a computer system of a purchaser without the express written permission [from CDK]." (Pl. Ex. K at TULLEY0002836.0001.) Additionally, Tulley "is NOT authorized to use the CDK licenses/equipment in any manner other than prescribed by the terms of the Agreement between the parties." (*Id*.) On April 3, 2015, John Murphy at Tulley emailed CDK to inform them to "discontinue the GM RIM program for Tulley Buick/GMC." (Pl. Ex. K at TULLEY0004873.0001.)

On April 6, 2015, Tulley's attorney responded to CDK's March 31 and April 1 letters. The letter provides an overview of Tulley's issues with the Drive system and CDK's proposed solutions and confirms that Tulley would be moving on to another DMS provider. (Pl. Ex. J at CDK014924–14928.) The letter informs CDK that it was CDK that failed "to provide products and services required under [the MSA]" by not providing Tulley a working system. (*Id*.) The letter also alleges that Tulley has suffered damages and losses as a "direct consequence of the fraudulent representations made at the time of sale of the MSA and the failure to deliver the product sold." (*Id*.) The letter informs CDK that Tulley

> has not terminated its contract with CDK and has continued to make payments under the [MSA]. Tulley reserves its right to use its own data, even if the same is currently sored on CDK equipment, particularly given that the data which was developed on CDK equipment came from my client and its supplier preceding ADP.

(*Id*.) Finally, the letter states that Tulley would "be happy to discuss with [CDK] a potential mutual agreement as to the resolution of the competing claims of your company and my client." (*Id*.)

9

On April 7, 2015, CDK's counsel responded to Tulley's April 6, 2015 letter. According to CDK's counsel, CDK had provided a working system and had gone above and beyond what was required. (Pl. Ex. M at API000364–366 (DE 267-5 at 20)) The letter takes the position that Tulley has decided to move forward with another DMS provider for its own reasons, rather than any defect in the Direct system, and is therefore financially liable. (*Id.*) The letter concludes with CDK's attorney offering to find an "amicable resolution of this matter to avoid court intervention." (*Id.*)

Based on a letter dated April 22, 2015, Tulley had authorized Jane Copeland to represent them in possible negotiations with CDK to find a mutual resolution regarding the "termination of Tulley Automotive Group, Inc.'s contracts with CDK Global." (*Id.* at API004043.) CDK again reiterated their position that they would be willing to settle the dispute for $382,428.52 and that pursuant to 18 U.S.C. § 1030, Tulley is not authorized to transfer the data in Drive to another computer system without express permission from CDK. (Pl. Ex. K at TULLEY0005990.0001–2.) Tulley's counsel responded with a counteroffer of $25,000 to settle the dispute. (Pl. Ex. J at CDK022480.)

CDK then proceeded to file this lawsuit asserting claims for breach of contract, replevin, contractual attorneys' fees, and conversion. After filing its complaint, Tulley and CDK arranged a date on which CDK would turn off Tulley's Drive service and pick up its equipment. (Pl. Ex. K at TULLEY0004884.0001–8.) CDK also requested that Tulley provide a formal termination notice to them, which Tulley did not do, on the premise that it was CDK, and not Tulley, which had terminated the MSA. (Def. Ex M.)

Tulley answered CDK's complaint and asserted five counterclaims against CDK: fraudulent inducement, rescission, breach of contract, violation of New Jersey Consumer Fraud Act, § 56:8-1 *et seq.* ("NJCFA"), and unjust enrichment. In my earlier opinion, I dismissed Tulley's rescission counterclaim, but allowed the other counterclaims to move forward. Now before me are CDK's

motion for summary judgment on Tulley's remaining counterclaims, and Tulley's motion or summary judgment on CDK's four claims.[5]

---

[5] CDK notes that Tulley's response to their Statement of Undisputed Facts (DE 278) violates both Fed. R. Civ. P. 56 and Local Rule 56.1, and as a result, the Court should deem as "admitted" their statement of material facts. (*See* DE 291.) Local Rule 56.1 states in part,

> [t]he opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement, indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion . . . [e]ach statement of material facts . . . shall not contain legal argument or conclusions of law.

I find that many of Tulley's responses to CDK's statement of material facts contain legal arguments, in contravention of Local Rule 56.1. I also find that much of the information contained in the responses should have been submitted as a "separate supplemental statement of disputed material facts, in separately numbered paragraphs citing to the affidavits . . . to substantiate the factual basis for the opposition," *id.*, in order to allow CDK to properly respond to Tulley's statements. I will not, however, automatically deem all of CDK's statement of material facts as "admitted." The Court has looked at the parties' respective exhibits to substantiate their assertions and has summarized the background information in Part I of this Opinion based on what the evidence reflects. I note however, that Tulley's response made it much more difficult to identify the universe of uncontested facts and was quite burdensome for the Court. *See Durkin v. Wabash Nat.*, No. 10-cv-2013, 2013 WL 1314744, at *6 (D.N.J. Mar. 28, 2013).

## II.    CDK Motion to Voluntarily Dismiss Counts II and IV of its Complaint

CDK has filed a motion to voluntarily dismiss Counts II and IV of its Complaint with prejudice pursuant to Fed. R. Civ. P. 41(a)(2). (*See* DE 290.) As stated above, CDK filed this action against Tulley on May 1, 2015. Counts II and IV of the Complaint assert claims of replevin and conversion against Tulley because at that time the Complaint was filed, Tulley was still in possession of CDK's hardware. A few weeks after CDK filed suit, Tulley arranged for CDK to pick up the equipment that is the subject of the replevin and conversion claims. (*See* DE 268 at 10–11.) Although CDK repossessed its hardware, it did not move to voluntarily dismiss those claims at that time, and this lawsuit continued to proceed through discovery and various dispositive motions.

Approximately five years later, on January 21, 2020, Tulley filed its motion for summary judgment on all counts, including CDK's replevin and conversion claims. (*See* DE 266.) In its Opposition Brief, CDK noted that it would be moving to voluntarily dismiss those two counts before Tulley's motion for summary judgment was fully briefed. (*See* DE 275 at 21.) CDK proposed to Tulley a joint stipulation to dismiss the replevin and conversion claims. Tulley did not agree; it wanted entry of a judgment on the merits for those two claims. (*See* DE 290-3.) CDK therefore filed a motion to voluntarily dismiss the replevin and conversion claims pursuant to Fed. R. Civ. P. 41(a)(2).

Federal Rule of Civil Procedure 41 governs voluntary dismissals of civil actions. Where, as here, the opposing party has already filed an answer to the complaint or a motion for summary judgment, an action may only be dismissed by court order. *See* Fed. R. Civ. P. 41(a)(2). "Whether to grant or deny a motion for voluntary dismissal is 'within the sound discretion of the district court.'" *Bringa v. Roque*, No. CIV. 2:13-3296 KM-MA, 2015 WL 857884, at *2 (D.N.J. Feb. 27, 2015) (citing *Hayden v. Westfield Ins. Co.*, No. 12-0390, 2013 WL 5781121, at *2 (W.D. Pa. Oct. 25, 2013). Generally, a Rule 41 motion should be granted unless the "defendant will suffer some prejudice other than the mere prospect of a second lawsuit." *Emmanouil v. Mita Mgmt., LLC*, No. CIV. 11-5575

12

MAS TJB, 2015 WL 5023049, at *2 (D.N.J. Aug. 24, 2015). In determining whether a voluntary dismissal will result in prejudice to the defendant, courts look to a variety of factors including, "(1) the expense of a potential second litigation; (2) the effort and expense incurred by defendant in preparation for trial in the present case; (3) the extent to which the case has progressed; and (4) plaintiff's diligence in bringing the motion to voluntarily dismiss." *Id.* (citing *Shamrock Creek, LLC v. Borough of Paramus,* No. 12–2716, 2015 WL 3902307, at *2 (D.N.J. June 23, 2015)).

The first two factors weigh in favor of granting the motion to dismiss. First, Tulley would not be exposed to further litigation, because CDK is moving to dismiss these claims with prejudice; second, the parties did not engage in any substantive discovery or litigation specifically in relation to those counts, which Tulley does not dispute.[6] On the other hand, the case has been pending for five years, and CDK clearly did not exercise diligence in seeking dismissal.

"The touchstone is prevention of substantial prejudice to the parties." *See Bringa,* 2015 WL 857884, at *2 (citing *DuToit v. Strategic Minerals Corp.*, 136 F.R.D. 82, 85 (D. Del. 1991)). Tulley will not be significantly prejudiced by dismissal of these claims. It does not appear that their presence in the case has significantly altered the course of discovery or litigation. Tulley was surely aware at all times that the equipment had already been returned, so that the requested relief was moot.[7]

---

[6] Tulley did not move to dismiss any of the counts in CDK's Complaint. Additionally, Tulley did not extensively brief these two claims in its motion for summary judgment, likely because the claims were already moot.

[7] Proceeding to a decision on the merits would pose problems of its own. Article III of the Constitution requires that "'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 729 F.3d 239, 247 (3d Cir. 2013) (citing *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71, 133 S. Ct. 1523, 1528, 185 L. Ed. 2d 636 (2013)). "An action is rendered moot when 'an intervening circumstance deprives the plaintiff of a 'personal stake in the outcome of the lawsuit,' at any point during the litigation." *Id.* (quoting *Lewis v. Cont'l Bank Corp.,* 494 U.S. 472, 477–78, 110 S. Ct. 1249 (1990)). Here, the replevin and conversion claims at least arguably became moot once CDK repossessed the equipment from Tulley, since CDK no longer had a

I will therefore grant CDK's motion to voluntarily dismiss its replevin and conversion counts. The dismissal is with prejudice.

## III.   Motions for Summary Judgment

Both CDK and Tulley have filed motions for summary judgment seeking dismissal of all claims asserted against them. Tulley alleges claims for common law fraud, violation of the NJCFA, breach of contract, and unjust enrichment. CDK's remaining claims against Tulley are for breach of contract and attorney's fees. I will first consider CDK's motion for summary judgment on Tulley's fraud claims, then proceed to the parties' dueling summary judgment motions for breach of contract, and then resolve some miscellaneous issues.

### a.  Legal standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex*, 477 U.S. at 322–23. "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

---

"personal stake" in the outcome of these claims. A jurisdictional dismissal, ironically, would be *without* prejudice, a counterproductive outcome from Tulley's point of view.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48. A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact

is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### b. Tulley's Counterclaim 1: Fraudulent Inducement

### i.  Choice of law

As a preliminary matter, the parties dispute the scope of the choice of law provision in the MSA. The MSA contains the following clause:

> This Agreement shall be governed in all respects by the laws of the State of New Jersey, without giving effect to principles of conflicts law. Client hereby consents to the jurisdiction of any federal or state court located in the State of New Jersey for all actions arising out of this Agreement and designates the County of Morris or the U.S. District Court, District of New Jersey, Newark, New Jersey as a proper venue for any such action against the Client and the exclusive forum for any action against ADP. . . .

(*See* DE 267-4, Pl. Ex. J at CDK000014.) The parties concede that that the choice-of-law provision requires that New Jersey law be applied their contractual claims; they disagree, however, as to whether it applies to Tulley's fraudulent inducement claim as well.[8]

CDK argues that because Tully's fraudulent inducement claim is not based on the MSA itself, the MSA's choice-of-law provision does not apply to it. (*See* DE 267 at 11.) New Hampshire, says CDK, is where Tulley's alleged injuries took place, and thus has the most significant relationship to the tort claims, which should be decided under New Hampshire law. Tulley responds that New Jersey law should apply to all claims because the choice-of-law clause is broad enough to encompass them, and because New Jersey has a substantial relationship to the case. (*See* DE 273 at 15.)

> In diversity cases such as this one, we look to the choice-of-law rules of the forum state—the state in which the District Court sits—in order to decide which body of substantive law to apply to a contract provision, ***even where the contract contains a choice-of-law clause***. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 85 L. Ed. 1477 (1941) (holding that a

---

[8]     I discuss the NJCFA claim separately *infra.*

federal court sitting in diversity must apply the choice-of-law rules of the forum state); *Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994) (applying Pennsylvania's choice-of-law rules in diversity case, despite the presence of choice-of-law clause selecting Illinois law, and concluding that Illinois law governs interpretation of indemnity clause of a lease agreement); *see also Weber*, 811 F.3d at 770-71 (explaining that "the presence or absence of a specific choice-of-law clause does not alter the core obligation of a federal court, sitting in diversity, to ascertain which body of substantive law to apply by implementing the choice-of-law rules of its home jurisdiction"); *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 641 (2d Cir. 2016); *H & R Block Tax Servs. LLC v. Franklin*, 691 F.3d 941, 943 (8th Cir. 2012); *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 623-24 (4th Cir. 1999); *Kohler v. Leslie Hindman, Inc.*, 80 F.3d 1181, 1184-85 (7th Cir. 1996).

*Zydus Worldwide DMCC v. Teva API Inc.*, No. CV1917086KMJBC, 2020 WL 2570043, at *7 (D.N.J. May 20, 2020) (citing *Collins On behalf of herself v. Mary Kay, Inc.*, 874 F.3d 176, 183 (3d Cir. 2017) (emphasis added)). New Jersey courts will "generally uphold[] choice-of-law clauses, so long as the clause 'does not violate New Jersey's public policy.'" *Carrow v. Fedex Ground Package Sys., Inc.*, No. 16-3026 (RBK/JS), 2017 WL 1217119, at *3 (D.N.J. Mar. 30, 2017) (citing *North Bergen Rex Transp., Inc. v. Trailer Leasing Co.*, 730 A.2d 843, 847 (N.J. 1999)). New Jersey applies Section 187 of the Restatement (Second) of Conflicts of Laws, which states that the law of the state chosen by the parties will apply unless:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which * * * would be the state of the applicable law in the absence of an effective choice of law by the parties.
> *Portillo v. Nat'l Freight, Inc.*, 323 F. Supp. 3d 646, 651–52 (D.N.J. 2018)

(citing *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 130 N.J. 324, 342, 614 A.2d 124, 133 (1992) (citing Restatement (Second) of Conflicts of Laws §

187)); *see generally Brauser Real Estate, LLC v. Meecorp Capital Markets, LLC*, No. CIV.A.06CV01816 (SDW), 2008 WL 324402 at *3 (D.N.J. Feb. 4, 2008), *aff'd*, 484 F. App'x 654 (3d Cir. 2012) (application of § 187)..

Tulley points to the broad phrase "in all respects" in the choice-of-law clause. (*See* DE 273 at 17.) Tulley also argues that its fraudulent inducement claim is not independent of or incidental to the contractual relationship; rather, it is aimed at the enforceability of the MSA itself. (*Id.*)

A narrowly drawn choice-of-law clause may legitimately be confined to matters of contract interpretation and breach. In *Portillo,* for example, this Court considered the following choice-of-law provisions:

> 23. GOVERNING LAW AND FORUM. This Agreement shall be interpreted in accordance with, and governed by, the laws of the United States and, of the State of New Jersey, without regard to the choice-of-law rules of New Jersey or any other jurisdiction. . . .
>
> J. GOVERNING LAW. This Agreement shall be governed by laws of the State of New Jersey, both as to interpretation and performance.

323 F. Supp. 3d at 648–49. *Portillo* reasoned that those provisions were drafted "narrowly" and did not apply "to any and all disputes arising out of the contracts, but rather only to 'interpretation' of the 'Agreement.'" Therefore, the court held, the contractual choice-of-law clause did not extend to plaintiffs' state statutory wage violation claims and other common law claims. Similarly, the Third Circuit considered the following choice-of-law provision: *"This agreement* will be governed by, and construed and enforced in accordance with, the laws of [Pennsylvania]." *Black Box Corp. v. Markham*, 127 F. App'x 22, 25 (3d Cir. 2005) (emphasis added). That clause, the Court held, was narrowly drafted to encompass only the agreement itself, "and not necessarily the entire relationship" among the parties.

On the other hand, even a facially contractual choice-of-law clause may extend to claims in tort:

> Where a contract's choice of law provision is "broad and all-encompassing," the provision "encompasses all tort claims that may arise from the [contract]." *Sullivan v. Sovereign Bancorp Inc. .,*

18

33 F. App'x 640, 642 (3d Cir.2002) (unpublished); *see also Verizon N.J., Inc. v. DMJM Harris, Inc.,* No. 08–3028, 2009 WL 1283173, at *4 (D.N.J. May 1, 2009) (holding that a contract's forum selection clause applied to tort claims because the claims "stemmed from the performance of the contract itself"); *Pro v. Hertz Equip. Rental Corp.,* No. 06–3830, 2008 WL 5218267, at *5 (D.N.J. Dec.11, 2008) ("Choice of law clauses that use the language 'governed and construed by' ... are considered to be broad capturing both contract and tort claims, particularly tort claims that relate to the contract."), *amended on other grounds.* 2009 WL 1010622 (D.N.J. Feb.3, 2009); *Delany v. Am. Express Co.,* No. 06–5134, 2007 WL 1420766, at *3, 5 (D.N.J. May 11, 2007) (applying New Jersey law to all of the plaintiff's claims, including fraud claims, where the contract at issue stated that it was "governed by the laws of the state in which it is delivered"). On the other hand, contract provisions which only use the term "construed under" are considered narrower and "sometimes [are] limited to contract claims and generally do not apply to tort claims that arise independent of the contract." *Hertz Equip,* 2008 WL 5218267, at *5 (emphasis added). In *Hertz Equip,* the court distinguished between cases where the tort claims "could be decided without consideration of the terms of the contract at issue" and those where the tort claims are "closely tied to the contract." *Id.* at *6.

*Demmick v. Cellco P'ship*, No. CIV.A. 06-2163 JLL, 2010 WL 3636216, at *3 (D.N.J. Sept. 8, 2010)

So even a clause phrased in terms of "this Agreement" may be broad enough to cover a tort claim, if the tort claim is closely related to the issue of the validity and enforceability of the contract. In *Sullivan v. Sovereign Bancorp, Inc.*, No. Civ.A. 99-5990, 2001 WL 34883989 (D.N.J. Jan. 19, 2001), the clause read, "This Agreement shall be governed by and construed in accordance with the domestic internal law (including the law of conflicts of law) of the Commonwealth of Pennsylvania." That clause, the court held, was "sufficiently broad to encompass contract-related tort claims such as fraudulent inducement." 2001 WL 34883989, *5–*6. The Third Circuit affirmed on that point. *See Sullivan v. Sovereign Bancorp, Inc.*, 33 F. App'x 640, 642 (3d Cir. 2002) ("the district court correctly concluded that the breadth of

the choice of law provision in the Agreement is 'broad and all-encompassing.' Accordingly, it encompasses all tort claims that may arise from the Agreement") (internal citations omitted)).

I am persuaded by the reasoning of *Sullivan.* Like the clause in that case, the clause in the MSA provides that "*[t]his Agreement,*" not the parties' relationship generally, "shall be governed in all respects by the laws of the State of New Jersey." Such a choice-of-law clause, if not broad enough to cover all potential claims, is broad enough to cover a tort, like fraudulent inducement, that is closely allied to the issue of the validity and enforceability of the contract.

Taking the analysis to the next step, I do not find that either of the exceptions outlined in Restatement § 187 applies here.

First, the state whose law is chosen, New Jersey, does not lack a substantial relation to the parties or the transaction. Although neither CDK nor Tulley is incorporated in the State of New Jersey, CDK is authorized to conduct business activities in this State and concedes that it does so. (Compl. ¶ 1.) More pertinently, Tulley has submitted evidence that, at the time of execution of the MSA, the predecessor contracting entity, ADPDS, likewise conducted substantial operations in New Jersey. Indeed, there is significant evidence, in the form of sworn statements by responsible representatives of ADPDS, that New Jersey was the site of ADPDS's principal office or principal place of business (*See* p. 3 n. 2, *supra.*) Oddly, there seems to be some conflict on that point, but at the very least there is a triable issue. Emails suggest that employees at an ADPDS's office in Parsippany, New Jersey, Terry McCoy and Peter Mari, exercised oversight over installation and Tulley's subsequent complaints about the operation of the system. (*See* Pl. Ex. J. at CDK007474-76, CDK008415-22, CDK010577-83 (DE 273-4).)[9] New Jersey therefore does

_____

[9]    Tulley executed an Equipment Lease with another ADP entity, ADP Leasing LLC, in order to rent certain hardware for their DMS configuration. (See Def. Ex. T.) Tulley submitted a declaration from the account collections manager for ADP

have a sufficient relationship to the parties and the transaction at hand. In addition, it does not appear that there is "no other reasonable basis for the parties' choice." Rest. § 187. The New Jersey choice-of-law provision is part of a standard contract that CDK/ADPDS used with many customers in many locations. Its self-evident purpose was to provide uniformity and predictability, and it was promulgated for that reason by the very party which now seeks to avoid it and obtain application of some other state's law.[10]

Concededly, were it not for the contractual choice-of-law clause drafted by CDK/ADPDS, the most-significant-relationship analysis might or might not suffice to require application of New Jersey law. The critical May 1, 2013 meeting, for example, took place in New Hampshire. But these New Jersey ties, even if not independently sufficient to require application of New Jersey law, are sufficient to require that the Court hold CDK to its own contractual choice of New Jersey law. Summary judgment for CDK is denied on this point.

Regarding the second § 187 exception, I do not find that the application of New Jersey law would be contrary to any fundamental policy of the State of New Hampshire. Nothing about protection of a New Hampshire party from fraud would offend the public policy of that state. *Cf. MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *8 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018) (choice-of-law clause invoking tribal law was contrary to public policy where it would expose New Jersey resident to illegal, usurious loan extended at rate of 116% p.a. by unlicensed lender). Indeed, the elements

---

Leasing in connection with another lawsuit stating that ADP Leasing is a Delaware company with its headquarters located in Parsippany, NJ. (*See* Def. Ex. LLL ¶ 6).]

[10]     I observe in passing that CDK, which now claims the matter has little or no connection to New Jersey, sued in New Jersey based on the New Jersey forum-selection clause, which is contained in the same paragraph as the choice-of-law provision. CDK also cited New Jersey law in connection with the earlier motion to dismiss.

of a claim for fraudulent inducement and misrepresentation are substantially the same under the laws of both states.[11]

Accordingly, I will apply New Jersey law to the fraudulent inducement counterclaim asserted by Tulley against CDK.

### ii.    Fraudulent inducement counterclaim: analysis

Tulley alleges that CDK knowingly made material misrepresentations about the Drive program in order to fraudulently induce Tulley to switch DMS systems and enter into the MSA with CDK. Under New Jersey law, a claim for fraudulent inducement comprises the following five elements: (1) a material representation of a presently existing or past fact; (2) made with knowledge of its falsity; (3) with the intention that the other party rely thereon; (4) resulting in reliance by that party; (5) to his detriment. *Metex Mfg. Corp.*, 2008 WL 877870, at *4 (citing *Jewish Ctr. of Sussex County v. Whale*, 432 A.2d 521, 524 (N.J. 1981)). The material misrepresentation must be shown by "clear and convincing evidence." *CPS MedManagement LLC v. Bergen Reg'l Med. Ctr., L.P.*, 940 F. Supp. 2d 141, 159 (D.N.J. 2013) (citing *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 435 (D.N.J. 1998)). "Thus, to defeat a defendant's motion for

---

[11]  *Compare RNC Sys., Inc. v. Modern Tech. Grp., Inc.*, 861 F. Supp. 2d 436, 451 (D.N.J. 2012) ("In order to establish a claim for fraudulent inducement, five elements must be shown: (1) a material representation of a presently existing or past fact; (2) made with knowledge of its falsity; and (3) with the intention that the other party rely thereon; (4) resulting in reliance by that party; (5) to his detriment.") (citing *Metex Mfg. Corp.*, 2008 WL 877870, at *4), *with Caledonia, Inc. v. Trainor*, 123 N.H. 116, 124, 459 A.2d 613, 617–18 (1983) (In order to prove a claim for fraudulent misrepresentation, a "plaintiff must prove that the defendant intentionally made material false statements to the plaintiff, which the defendant knew to be false or which he had no knowledge or belief were true, for the purpose of causing, and which does cause, the plaintiff reasonably to rely to his detriment.").

As to fraudulent inducement, ordinary choice-of-law principles might thus result in a New Jersey court's defaulting to forum law in the absence of an actual conflict. *P.V. v. Camp Jaycee*, 197 N.J. 132, 143 (2008) ("Procedurally, the first step is to determine whether an actual conflict exists. That is done by examining the substance of the potentially applicable laws to determine whether there is a distinction between them.") (internal quotations omitted). "[I]f no conflict exists, the law of the forum state applies." *Snyder v. Farnam Companies, Inc.*, 792 F. Supp. 712, 717 (D.N.J. 2011) (quoting *P.V.*, 197 N.J. at 143).

summary judgment, a plaintiff must meet his or her 'burden of coming forward with evidence which could lead a jury to find clear and convincing proof of fraud . . . ." *Id.*

Tulley alleges that during the course of negotiations, CDK made the following representations, which Tulley relied on to its detriment:

- During a May 1, 2013 meeting between Jeff Evans and Patti Krueger from CDK and Bryan Tulley, Jack Tulley, Mark Tulley, and John Murphy from Tulley Automotive, CDK represented that the Drive system would "reduce complexity" and "was more intuitive in sales and service, and . . . would reduce the number of steps to complete a process."

- CDK represented that the Drive DMS would save Tulley "time and money" and would make Tulley "more profitable."

- CDK represented that the new DMS "could handle all of the functions provided by Tulley Automotive's then-current DMS vendor Arkona (or DealerTrack), as well as the functions provided by DealerSocket, Firstlook, and Tulley Automotive's payroll company known as Trivantis Corporation, Inc."

- Mr. Evans furnished a cost comparison analysis, comparing Tulley's current DMS and payroll setup to CDK's setup, which was deceptive and misleading.

- CDK represented that the Drive DMS would save Tulley time when doing its payroll.

- CDK represented that the Drive DMS would (1) integrate with Tulley's own payroll setup and (2) integrate with DealerSocket and Firstlook.

- CDK represented that all the information in Tulley's current DMS product would transfer easily and accurately to CDK's DMS product.

- CDK represented that it would be capable of serving Tulley's needs as a multi-dealer business.

*See* AC ¶¶ 28–43. Tulley alleges that but for these material misrepresentations, Tulley would not have entered into the MSA with CDK.

CDK argues that summary judgment should be granted in its favor on Tulley's fraudulent inducement claim because Tulley has not presented sufficient evidence to demonstrate fraud based on Mr. Evans's alleged misleading statements. First, CDK states that Tulley has not presented clear and convincing evidence that Mr. Evans made any of those alleged statements at the May 1, 2013 meeting because none of the Tulley representatives at the meeting could quote them precisely. I disagree. Even if the Tulley brothers cannot reproduce Jeff Evans's precise language, John Murphy's contemporaneous notes from the May 1 meeting support Tulley's allegations as to the substance of Evans's statements: *i.e.,* that the Drive system was suitable for Tulley's needs and that it would fully integrate with Tulley's other software programs. (*See* Def. Ex. SSS.)

The record contains further corroboration in the form of emails demonstrating that Mr. Evans made statements to Tulley regarding the efficacy of Drive prior to signing of the MSA. For example, an April 13, 2013 email from Evans to Julie Loud states the following:

> If the Tully's are willing to plug existing profit leaks , increase CSI and SSI by being able to respond internally and externally quicker and reduce expenses by eliminating third party vendors with [CDK]'s integrated solution at a very competitive price yet increase over what you pay for Arkona today;. Then I am your man and [CDK] is your company.

*See* Pl. Ex. K at TULLEY0003238.0001. Viewing this evidence in the light most favorable to Tulley, I find sufficient evidence to create and issue as to whether CDK made certain representations to Tulley about the capabilities and suitability of the DMS system.

Even if Jeff Evans made these representations about Drive, however, I cannot ultimately find that they are actionable on a fraud theory. Fraud is a far

narrower theory than breach of contract; it does not cover an ordinary breach of promise about future events. The first element of a fraud claim is that a party has made a "material representation of a presently existing or past fact." *CPS MedManagement LLC*, 940 F. Supp. 2d at 158. Predictions, promises, and statements about future profitability are typically viewed as falling outside the category of actionable fraud. *Id.* at 159. Statements about "future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong." *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 435 (D.N.J. 1998) (citing *Chatlos Systems, Inc. v. National Cash Register Corp.,* 479 F. Supp. 738, 749–49 (D.N.J.1979), *aff'd in part, rev'd in part,* 635 F.2d 1081 (3d Cir.1980)). Additionally, "statements that can be categorized as 'puffery' or 'vague and ill-defined opinions' are not assurances of fact and thus do not constitute misrepresentations." *Id.* (citing *Diaz v. Johnson Matthey, Inc.,* 869 F.Supp. 1155, 1165 (D.N.J. 1994)).

I find that some of Jeff Evans's statements were not statements of fact at all, but fall within the category of "vague and ill-defined opinions" about future events. For example, any statements that the Drive system would save Tulley "time and money," would make Tulley "more profitable," and would reduce complexity, are generalities about the future, and thus cannot be the basis of a fraudulent inducement claim. *See Alexander*, 991 F. Supp. at 436 ("predictions of the future, which were believed when made, cannot serve as a basis for a fraud claim just because they subsequently turn out not to be true.").

On the other hand, some of Mr. Evans's other statements are at least factual in nature. For example, Evans stated that Drive would integrate with Tulley's preexisting software programs, such as "Dealersocket" and "First Look"; John Murphy testified that this turned out to be untrue, because Drive DMS did not integrate with Dealersocket "one hundred percent." (*See* Pl. Ex. K at TULLEY0004582.0001–2; Pl. Ex. B at 179:20–181:6; Pl. Ex. A at 205:18–206:25; Pl. Ex. E at 120:14-16; Ex. C at 90:15–22.) Tulley also alleges that Mr.

Evans represented that all the information in Tulley's current DMS product would transfer easily and accurately to the Drive DMS product; there is evidence, however, that Tulley's data in its prior DMS system did not transfer easily or accurately to Drive. Tulley also asserts that Mr. Evans represented that CDK would be capable of serving Tulley's needs as a multi-dealer business, but CDK was unable to correctly assess their needs as a multi-franchise dealership at the outset. These statements are at least reasonably specific, and I cannot simply set them aside as non-factual "puffery."

Nevertheless, even as to these statements, Tulley has not presented clear and convincing evidence that Mr. Evans knew they were false when he made them. Tulley argues that CDK was aware of Tulley's business needs and that they should have given Tulley three separate logons from the very beginning. (*See* DE 273 at 26–28.) However, much of the evidence that Tulley relies on to prove fraudulent intent are emails or testimonies from Tulley employees dating from the period when Tulley was experiencing issues with Drive. These documents do not show that Mr. Evans or CDK knew that their statements regarding the suitability of Drive were false at the time they were made—*i.e.,* when Evans was inducing Tulley to enter into the contract. Tulley points to evidence from veteran CDK employees who stated that it was inappropriate to sell a single-logon system to a dealership that has multiple franchises. (*See* Def. Ex. A at 20, Def. Ex. DDD.) The claim, however, is one of fraud, not negligence or malpractice. At any rate, this opinion evidence, which came from CDK employees not involved in the Tulley transaction, does not establish that Evans, for example, knew from the outset that the single-logon system would not work and concealed that fact. In fact, CDK has presented evidence that from 2013-2018, about 50% of the Drive installations for multi-franchise dealerships, like Tulley's, were successfully set up with a single logon and that deciding whether to provide a single or multiple logons is a judgment call, site-specific to each particular dealership. (*See* Pl. Ex. H at 53:10–54:16; Pl. Ex. J at CDK022483.) So even if things did not turn out well, I do not find sufficient

evidence that CDK had the requisite knowledge and intent to defraud Tulley at the time of contracting, when it made the alleged representations.

Tulley also bases its fraud claim on alleged material omissions. Specifically, Tulley alleges that CDK ignored and concealed known issues about the Drive system and concealed the fact that CDK customers across the country had voiced the same complaints as Tulley regarding the Drive system. (*See* AC ¶¶ 77–86, 95.) Tulley supports its fraudulent-omission claim by pointing to lawsuits in which automobile dealerships have raised issues similar to the ones that Tulley has raised in this suit. Tulley also points to letters written by other dealerships expressing their frustrations with the Drive system. (*See id.*) Nondisclosure of a material fact may "constitute fraud, but only when there is a duty to speak." *Multicultural Radio Broad., Inc. v. Korean Radio Broad., Inc.*, No. CV 15-1961 (SRC), 2015 WL 13229231, at *4 (D.N.J. Nov. 20, 2015) (citing *Baldasarre v. Butler*, 254 N.J. Super. 502, 521 (N.J. Super. Ct. App. Div. 1992), *aff'd in part, rev'd in part*, 132 N.J. 278 (N.J. 1993)). I find that Tulley has not presented sufficient evidence to demonstrate a claim for fraudulent omission. First, Tulley has not pointed to an affirmative duty on the part of CDK to inform prospective clients like Tulley about pending lawsuits related to Drive. Additionally, Tulley has not pointed to any evidence that Jeff Evans or any of the individuals involved in the Tulley transaction actually knew about the pending lawsuits or purposefully concealed this information from Tulley in order to induce them to enter into the MSA.

Because Tulley has not presented clear and convincing evidence to demonstrate that CDK had the requisite intent to defraud Tulley with the alleged misrepresentations, or that CDK made material omissions to defraud Tulley, I will grant CDK's motion for summary judgment on Tulley's counterclaim for fraud in the inducement.

### c. Tulley's Counterclaim 4: NJCFA

Tulley also alleges that CDK violated the New Jersey Consumer Fraud Act based on the same alleged misrepresentations and fraudulent omissions

that underlie the common law fraudulent inducement claim. CDK argues that it is entitled to summary judgment on this claim because the NJCFA does not apply to out-of-state consumers' claims, CDK's Drive system does not fall within the definition of "merchandise" under the NJCFA, and because Tulley has not presented sufficient evidence to establish a prima facie NJCFA claim.

At the outset, CDK argues that the NJCFA cannot apply to the claim of an out-of-state consumer, such as Tulley, which is based in New Hampshire. This argument is related to the earlier issue concerning the contractual choice-of-law provision and the fraudulent inducement claim. I therefore incorporate the analysis from Section III.b.i, *supra*. This is not a case in which New Jersey has "no substantial relationship to the parties or the transaction" and "there is no other reasonable basis for the parties' choice." Rest. § 187.

CDK cites *Maniscalco v. Brother Int'l (USA) Corp.*, in which the Third Circuit held that the NJCFA did not apply to the plaintiff/appellant's consumer fraud claim because his home state of South Carolina had the most significant relationship to the case, notwithstanding that the defendant corporation was headquartered in New Jersey. 709 F.3d 202, 204 (3d Cir. 2013). *Maniscalco* is distinguishable from this case, however, because there was no contractual choice of law clause, so the choice-of-law analysis relied solely on the most-significant-relationship test.

Here, as discussed above, the MSA does contain a New Jersey choice-of-law provision. That choice-of-law provision was drafted by CDK (or rather its predecessor, ADPDS) in its own interest. True, the clause might not be broad enough to cover a NJCFA claim arising incidentally from the parties' ongoing relationship. Tulley emphasizes, however, that its NJCFA claim is aimed more narrowly at the validity and enforceability of the MSA—implying that it is essentially the fraudulent inducement claim in statutory guise. For the reasons stated above, then, I hold that the choice-of-law provision is broad enough to require application of the NJCFA. *See* Section III.b.i, *supra*.

The question remains whether the NJCFA claim, like its common law counterpart, falls short on the merits. I conclude that it does not.

28

NJCFA prohibits "[t]he act, use, or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon the act in connection with the sale or advertisement of any merchandise . . . ." N.J. Stat. Ann. § 56:8–2. The statute's "history has been 'one of constant expansion of consumer protection.'" *All the Way Towing, LLC v. Bucks Cty. Int'l, Inc.*, 236 N.J. 431, 442 (2019) (citing *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 604, 691 A.2d 350 (1997)). The NJCFA protects the public, "even when a merchant acts in good faith." *Id.* (citing *Cox v. Sears Roebuck & Co.*, 138 N.J. 2, 16, 647 A.2d 454 (1994)). Courts have consistently recognized that the NJCFA must be liberally construed because of the Act's "original remedial purpose and its subsequent and continuous expansion by the Legislature. . ." *Id.* Thus, it is against that backdrop that I will assess whether CDK's Drive system is considered merchandise underneath the NJCFA.

It is well-established that the NJCFA applies to certain commercial transactions. *Id.* at 443. The statute defines "person" to include business entities, and "a corporation may qualify as a person under the Act when it finds itself in a consumer[-]oriented situation." *Trocki v. Penn Nat'l Mut. Cas. Ins. Co., Inc.*, No. 119CV13638NLHKMW, 2020 WL 3468217, at *3 (D.N.J. June 24, 2020) (citing *BOC Group, Inc. v. Lummus Crest, Inc.*, 597 A.2d 1109, 1112 (N.J. Super. Ct. Law Div. 1990)). As stated in my prior opinion to CDK's motion to dismiss Tulley's NJCFA claim, "[t]o fall within the scope of the NJCFA, goods and services need not be only those that are purchased by 'average consumers'; the statute may also cover merchandise that is 'expensive, uncommon, or only suited to the needs of a limited clientele.'" *CDK Glob., LLC v. Tulley Auto. Grp., Inc.*, No. 15-3103 (KM) (JBC), 2016 WL 1718100, at *6 (D.N.J. Apr. 29, 2016) (citing *Prescription Counter v. AmeriSource Bergen Corp.*, 2007 WL 3511301, at *14 (D.N.J. Nov. 14, 2007)).

29

The NJCFA also defines "merchandise" to include "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale." N.J. Stat. Ann 56:8-1(c). If the business itself consumes or uses the goods and services, as opposed to being purchasing them for resale, designs, and franchises, the transaction may be covered by the NJCFA. *Id.* at *6. Whether the sale of "merchandise" in a business-to-busines transaction falls within the scope of the NJCFA depends on the nature of the transaction. *All the Way Towing, LLC*, 236 N.J. at 408. To make that determination, a court should consider the following four factors:

> (1) the complexity of the transaction, taking into account any negotiation, bidding, or request for proposals process; (2) the identity and sophistication of the parties, which includes whether the parties received legal or expert assistance in the development or execution of the transaction; (3) the nature of the relationship between the parties and whether there was any relevant underlying understanding or prior transactions between the parties; and, as previously noted; (4) the public availability of the subject merchandise.

*All the Way Towing, LLC*, 236 N.J. at 447–48.

CDK argues that under the four *All the Way* factors, the Drive system would not be considered merchandise underneath the NJCFA. I disagree. At the very least, there are underlying factual disputes that would preclude granting summary judgment to CDK on the "merchandise" issue.

First, CDK and Tulley did not have a relationship prior to their negotiation regarding the Drive system in 2013. Second, even though CDK presents evidence demonstrating the sophistication of Tulley's business practices, that alone does not demonstrate that Tulley was a sophisticated consumer in this particular transaction. Tulley has presented evidence that it had no specialized knowledge of the Drive DMS system and relied on CDK to provide a DMS program suited to CDK's needs. Indeed, "a business entity can be, and frequently is, a consumer in the ordinary meaning of that terms." *Hundred East Credit Corp. v. Eric Shuster Corp.*, 212 N.J. Super 350, 354–56, 515 A.2d 246 (N.J. Super. Ct. App. Div. 1986). The *Hundred East* court

30

recognized that "[e]ven the most world-wise business entity can be inexperienced and uninformed in a given consumer transaction." *Id.* at 356. Furthermore, unlike the business consumer in *Maruka USA, Inc. v. Specialty Lighting Indus., Inc.*, Tulley argues that it did not have more specialized knowledge on DMS systems than the general public, and also did not communicate with experts or legal counsel prior to entering into the MSA. *See* No. A-2220-17T4, 2019 WL 5690501, at *7 (N.J. Super. Ct. App. Div. Nov. 4, 2019), *appeal denied*, 241 N.J. 53, 224 A.3d 1065 (2020).

Third, I find that there are material factual disputes that preclude a determination on whether the transaction between Tulley and CDK would be considered "complex" under the *All the Way* factors. CDK argues that this transaction was more akin to the transaction found in *Princeton Healthcare System v. Netsmart New York, Inc.*, 422 N.J. Super. 467, 29 A.3d 361 (N.J. Super. Ct. App. Div. 2011). In *Princeton Healthcare*, the court found that the NJCFA did not apply to the transaction at issue, which was a negotiated contract for the installation and implementation of a complex computer software system for a healthcare facility. There, the plaintiff hospital and healthcare provider asked for requests for proposals, to which defendant submitted a 149-page response. *Id.* at 469–70. The transaction also entailed a lengthy process of evaluation and detailed negotiations that required the input of plaintiff's computer consultant and legal counsel prior to entering into the contract. *Id.*

CDK argues that Tulley entered into an agreement for a "complex software system" that required two years of negotiations and that their DMS system needed substantial customization. (*See* DE 267 at 21–22.) I find however, material differences between this transaction and the one in *Princeton Healthcare*. Here, Tulley never put out requests for proposals and did not seek legal advice prior to entering into the MSA. Although Tulley considered reaching out to Jane Copeland, an expert on DMS products, for advice, Tulley ultimately decided not to. Furthermore, while the Drive system was customized

to Tulley's business needs, the NJCFA may apply to custom-made goods. *See All the Way Towing, LLC*, 236 N.J. at 444. CDK and Tulley also negotiated the details of the MSA over the course of several months, not two years, as CDK contends. (CDK reached out to Tulley in April 2013 and the parties entered into the MSA in June 2013.) While it seems that Tulley was able to provide input on some of the terms of the MSA, for the most part, the MSA that the parties executed is CDK's standard form contract. *See* Def. Exs. OOO–QQQ. There are issues of fact to be resolved in order to determine whether the transaction between CDK and Tulley was too complex to be covered by the NJCFA.

Finally, I also find that there are material factual disputes as to the public availability of the Drive DMS system. CDK argues that Tulley has not demonstrated that the CDK DMS can be purchased by a member of the public because CDK's only clients are within the auto dealership industry; that the general public has no use for CDK's products and services; and that CDK salespersons are only allowed to sell their Drive system to dealerships within a defined database. (*See* Pl. Ex. H at 112:4–15.) Tulley, on the other hand, has presented evidence that CDK sold its DMS product to a diverse client base within the automotive retail industry, including dealerships and original equipment manufacturers. Additionally, CDK's 2019 10-K states that they provide solutions to "retailers and manufacturers of heavy trucks, construction equipment, agricultural equipment, motorcycles, boats, and other marine and recreational vehicles." (*See* DE 273 at 29.) Courts have found that products suited to the needs of a limited clientele base can still be considered goods that are available to the "public at large." *See Prescription Counter v. AmerisourceBergen Corp.*, No. CIV A 04-5802 SRC, 2007 WL 3511301, at *16 (D.N.J. Nov. 14, 2007) ("Although the product may have been only suited to the needs of only a limited clientele, it appears to be available to the public at large."); *see also Naporano Iron & Metal Co. v. Am. Crane Corp.*, 79 F. Supp. 2d 494, 509 (D.N.J. 1999) (court found that purchaser of a large crane for business use was a "consumer" within the meaning of the NJCFA). This record

32

presents issues of fact as to whether CDK's DMS system is "merchandise" that is available to the "public at large," within the meaning of the NJCFA case law.

CDK argues more generally that Tulley has not presented sufficient evidence to establish the elements of a prima facie NJCFA claim. I disagree. The NJCFA requires a plaintiff to prove three elements: "(1) unlawful conduct by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's unlawful conduct and the plaintiff's ascertainable loss." *Dzielak v. Whirlpool Corp.*, No. CV 12-89 (KM) (JBC), 2019 WL 6607220, at *21 (D.N.J. Dec. 5, 2019), *reconsideration denied*, No. CV 12-89 (KM) (JBC), 2020 WL 3989648 (D.N.J. July 15, 2020) (citing *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 557, 964 A.2d 741 (2009) (citations omitted)). Under the NJCFA, "unlawful conduct" falls within three general categories: "affirmative acts, knowing omissions, and violation of regulations promulgated under N.J. Stat. Ann. §§ 56:8-2, 56:8-4." *Id.* Unlike a claim for common law fraud, if the alleged consumer-fraud violation consists of an affirmative act under the NJCFA, intent is *not* an essential element, and the plaintiff does not need to prove that the defendant intended to commit an unlawful act. *See Cox*, 138 N.J. at 17–18, 647 A.2d at 462 (citing *Chattin v. Cape May Greene, Inc.,* 124 *N.J.* 520, 522, 591 *A.*2d 943 (1991) (Stein, J. concurring)).

A reasonable jury could find that Jeff Evans's alleged statements constituted affirmative misrepresentations under the CFA. "An affirmative misrepresentation under the CFA is one which is material to the transaction and which is a statement of fact, found to be false, made to induce the buyer to make the purchase." *Cold Star Sales & Leasing, Inc. v. TRU Aseptics, LLC*, No. 119CV14030NLHAMD, 2020 WL 1910334, at *6 (D.N.J. Apr. 17, 2020) (citing *Chaudhri v. Lumileds LLC*, No. CV182167KMCLW, 2018 WL 6322623, at *6 (D.N.J. Dec. 3, 2018) (internal quotation marks omitted)). For the same reasons stated in Part III.b.ii, *supra*, I find that some of Mr. Evans's statements could constitute material misrepresentations of fact. Because the NJCFA, unlike

common law fraud, does not require proof of intent to defraud, I find that Tulley could satisfy the first element of "unlawful conduct" to establish a NJCFA claim.[12]

CDK also argues that Tulley has not demonstrated an ascertainable loss under the NJCFA. A private cause of action under the NJCFA requires that the plaintiff demonstrate "a loss attributable to conduct made unlawful by the CFA." *BJ Am. Elec., LLC v. BMW N. Am., LLC*, No. A-2517-17T1, 2019 WL 2028706, at *7 (N.J. Super. Ct. App. Div. May 8, 2019), *cert. denied,* 239 N.J. 599, 219 A.3d 154 (2019) (citing *Dugan v. TGI Fridays, Inc.*, 231 N.J. 24, 50, 171 A.3d 620 (2017)). The ascertainable loss prong of a prima facie NJCFA case requires the plaintiff to "suffer a definite, certain and measurable loss, rather than one that is merely theoretical." *Id.* (citing *Bosland v. Warnock Dodge, Inc.*, 197 N.J. 543, 558, 964 A.2d 741 (2009)). In other words, the loss must be quantifiable or measurable, even if it is not necessarily monetary. *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 248, 872 A.2d 783, 792 (2005). An "ascertainable loss occurs when a consumer receives less than what was promised." *Id.* "In cases involving breach of contract or misrepresentation, either out-of-pocket loss or a demonstration of loss in value will suffice to meet the ascertainable loss hurdle and will set the stage for establishing the measure of damages." *Id.*

Tulley alleges that as a result of CDK's misrepresentations, it has incurred damages in an amount of at least $3.5 million. Tulley fails to substantiate that figure with evidence. (*See* DE 22 ¶ 116.) Tulley also alleges that it experienced a drop in customer satisfaction, that employee morale diminished, and that it lost its "Center of Excellence" rating from BMW. These

---

[12]   Tulley has not, however, adduced sufficient evidence to go forward on an omission theory. "[W]hen the alleged consumer fraud consists of an omission, the plaintiff must show that the defendant acted with knowledge, and intent *is* an essential element of the fraud." *Cox*, 138 N.J. at 17–18, 647 A.2d at 462. *Id.* (emphasis in original). As discussed above, Tully has not put forward evidence that CDK withheld information about the Drive DMS with the intent to defraud Tulley. *See* Part IV.b, *supra.*

*sequelae,* I find, cannot constitute an ascertainable loss under the NJCFA because they are not expressed with enough specificity to be considered quantifiable or measurable.

Tulley also argues, however, that the Drive System it obtained was worth less than the one it bargained for. (*See* DE 273 at 34.) Assuming that the system was subpar, as claimed, that theory is plausible. Flaws in the Drive system, according to Tulley, also required them to hire and pay additional staff. Either of these could constitute an ascertainable loss sufficient to satisfy the third prong of an NJCFA claim.[13]

Finally, CDK also argues that Tulley cannot demonstrate an ascertainable loss because they were willing to remedy all of Tulley's issues at no cost to Tulley. I find, however, that there are material factual disputes as to whether such efforts had failed, and whether CDK ever communicated to Tulley that it would not have to pay to reconfigure the Drive system. (*See* Part I, *supra.*)

As a result, I will deny CDK's motion for summary judgment on Tulley's NJCFA counterclaim.

### d. Economic Loss Doctrine and the MSA's Integration Clause

CDK reasserts its argument that Tulley's fraud claims should be dismissed pursuant to the economic loss doctrine and the MSA's integration clause. For reasons similar to those expressed in my prior opinion on the motion to dismiss, I reject that argument. I find that the frauds alleged in Tulley's counterclaims are—to some degree—extrinsic to the MSA. *See Petric & Assocs., Inc. v. CCA Civil, Inc.*, No. A-3571-17T2, 2020 WL 3041418, at *11 (N.J. Super. Ct. App. Div. June 8, 2020) ("in order to maintain simultaneous claims in tort and contract, a defendant must "cause harm to the plaintiff distinct from those caused by the breach of contract.") *Grp., Inc. v. Philadelphia*

_____

[13]   I do not here propose to enumerate all possible elements of damages or calculate their amount. I am merely determining whether some ascertainable loss, sufficient to satisfy that essential element of the NJCFA, is present.

*Elec. Co.*, 722 F. Supp. 184, 201 (D.N.J. 1989). As noted above, for example, Tulley claims not merely traditional benefit-of-the-bargain contract damages, but also consequential damages of a kind available only in tort.

### e. The Breach of Contract Claim and Counterclaim

CDK and Tulley assert dueling claims of breach of contract. Tulley alleges that CDK breached the contract by not providing equipment that was in "good working order," and that the services and software that did not "conform to their respective functional and technical specifications" as set forth in the MSA. *See* DE 22 ¶¶ 101–105. CDK alleges that Tulley breached the MSA when it committed several "Events of Default"—chiefly, termination of the MSA prior to the expiration of the contract term and failure to pay the liquidated damages required under the MSA for any event of default. (DE 1 ¶¶ 32–38.)

Although CDK moved for summary judgment on Tulley's breach of contract counterclaim (*see* DE 265), it failed to include legal arguments on this point in its memorandum of law. (*See* DE 267.) I will not hypothesize arguments on CDK's behalf. CDK's motion for summary judgment on Tulley's breach-of-contract counterclaim is denied.

I turn to Tulley's motion for summary judgment on CDK's breach-of-contract claim. Tulley denies that it committed an event of default under Section 16 of the MSA when it decided to switch DMS providers before the term of the MSA expired. Specifically, Tulley argues (a) that early termination of the MSA is not listed as an event of default in the MSA, and (b) that even if it was, there is no evidence that Tulley actually terminated the MSA, because Tulley continued to make every monthly MSA payment until CDK filed this lawsuit.[14]

As to the issue of default, Section 16 of the MSA provides as follows:

---

[14] Under New Jersey law, a breach of contract claim requires proof of three elements: "(1) the existence of a valid contract; (2) a breach of that contract; and (3) resulting damage to the plaintiff." *RNC Sys., Inc.*, 861 F. Supp. 2d at 444–45 (citing *Ramada Worldwide, Inc. v. Kim*, No. 09–4534, 2010 WL 2879611 at *3 (D.N.J. July 15, 2010); *AT & T Credit Corp. v. Zurich Data Corp.*, 37 F. Supp. 2d 367, 370 (D.N.J. 1999)). Tulley asserts in a footnote that it is moving for summary judgment based solely on the second element, *i.e.*, the existence of a breach. (DE 268 at 15 n.7.)

16. DEFAULT BY CLIENT; REMEDIES UPON DEFAULT

A. Should [Tulley] (i) fail to pay when due any sum of money due hereunder or pursuant to any of the Schedules hereof, **(ii) default in the performance of any of its other obligations under this Agreement or any of the Schedules hereto**, (iii) default in the performance of any of its obligations under any agreement with any affiliate of [CDK] (or any assignee thereof or successor thereto), or (iv) become the subject of any proceeding under the Bankruptcy Code of any state bankruptcy law, or become insolvent, or have any substantial part of its property become subject to any levy, seizure, assignment, or application or sale for or by any creditor or governmental agency, then in such event [CDK], at its option, may, upon written notice thereof, (A) terminate this Agreement and/or any or all of the Schedules hereto, (B) declare all amounts due and to become due under this Agreement (including, in particular, Paragraph 16.B below) and/or any or all of the Schedules hereto immediately due and payable, (C) whether or not this Agreement or a Schedule is terminated, render any Services or portions thereof inoperable and/or inaccessible to [Tulley], and/or take immediate possession of any or all of the Software and items of Equipment not fully paid for, wherever situated, and for such purposes enter upon any premises without liability for so doing, and (D) sell, dispose of, hold, use or lease any items of Equipment not fully paid for, as [CDK], in its sole discretion, may decide. [Tulley] agrees to reimburse [CDK] for any and all expenses [CDK] may incur, including reasonable attorney's fees, in taking any of the foregoing actions. **The remedies contained in this Paragraph 16.A are cumulative and are in addition to all other rights and remedies available to [CDK] under this Agreement, by operation of law or otherwise.**

B. [**Tulley] specifically acknowledges and agrees that if [Tulley] terminates this Agreement and/or any Schedule (or any Service, Maintenance Service, Support Service or license to any Software set forth on any Schedule) or [CDK] terminates this Agreement or any Schedule due to [Tulley's] default pursuant to Paragraph 16.A above, [CDK] shall be entitled to recover agreed upon liquidated damages** in an amount equal to the product of: (i) the number of full monthly periods remaining after the date of termination under the then end of the application Schedule(s) of the Agreement, as applicable, (ii) the applicable monthly charges of the applicable Services, Software, Equipment, Support Services and Maintenance Services as of the effective time of any such termination; and (iii) .70 (representing a reduction facto which the parties have mutually determined to be fair and

37

> reasonable in light of the anticipated harm to be caused by the
> breach, the difficulties of proof of loss, and the unavailability of an
> adequate remedy.

(Def. Ex. M ¶ 16 (emphasis added).) The MSA does not define or enumerate
every event of default. The MSA does specifically state that the scope of the
agreement is that CDK would provide Tulley all the services described in the
Schedules attached to the MSA, licenses and/or sublicenses to various
software, software support services, equipment listed in the MSA Schedule, and
maintenance for services of said equipment. (*Id.* ¶ 1.) The Schedules to the
MSA state that the term of the Agreement would last for a period of 60 months.
(*Id.* at CDK000016.)

"An ambiguity in a contract exists if the terms of the contract are
susceptible to at least two reasonable alternative interpretations[.]" *Schor v.
FMS Fin. Corp.*, 357 N.J. Super. 185, 191, 814 A.2d 1108, 1112 (App. Div.
2002) (citing *Nester v. O'Donnell*, 301 N.J. Super. 198, 210, 693 A.2d 1214
(App. Div. 1997)). In order to determine the meaning of the terms of an
agreement, the terms of the contract "must be given their plain and ordinary
meaning." *Id.* When "the terms of a contract are clear and unambiguous, there
is no room for interpretation or construction, and courts must enforce those
terms as written." *Id.* The court cannot write a contract "merely because one
might conclude that it might well have been functionally desirable to draft it
differently." *Id.* Reading the MSA's various provisions together as a whole, it is
clear that the purpose of the MSA was for CDK to lease its DMS software to
Tulley, and to provide maintenance services for the rented software and
equipment should any issues arise, for a term of five years. Thus—absent other
facts—unilateral termination of the MSA and switching DMS providers prior to
the expiration of the contract's five-year term would be an event of default
under Paragraph 16.A of the MSA.

Still, the factual issue of termination is cloudy. No doubt some
gamesmanship was going on, with each side attempting to provoke the other

into actually declaring the agreement to be terminated. A fact finder must look to the substance of what occurred.

More importantly, the issue is tied up with another factual dispute: whether a prior breach by CDK excuses any default by Tulley. The two sides' duties—on the one hand, to install and maintain a functional system, and on the other, to pay for it— were mutually dependent. Suppose, for example, that CDK had done nothing at all to discharge its obligations to install and maintain the Direct system. It would not be reasonable to say that Tulley was nevertheless required to wait five years to secure a substitute system. The issues of who breached, and when, are factual.

I will therefore deny both sides' motions for summary judgment on the breach of contract claims.

### f. Contractual Limitation of Liability Clause

CDK also argues that summary judgment should be granted in their favor on both of Tulley's contractual and fraud-based claims because the MSA specifically limits their liability for any breach of contract claim. The limitation of liability section states in part:

> [CDK's] sole obligation in the case of any breach of any representations and warranties set forth above . . . shall be . . . to use reasonable efforts to correct any Services or Software which is not in compliance with the warranties provided [above]. . . .

> [CDK] shall not have any liability under this Agreement for any money damages resulting from claims made by [Tulley] or any third party for any and all causes covered by [the above] paragraph. [CDK's] sole liability under this Agreement for money damages resulting from claims made by Client or any third party arising from or related to any and all causes not covered by [the above paragraph] shall not exceed the lesser of (i) the amount of actual damages incurred by Client, and (ii) an amount which will not exceed one month's average total monthly charge paid by Client for the particular Services, Software, Equipment, Support Services or Maintenance Services. . . .

> IN NO EVENT WILL [CDK] BE RESPONSIBLE FOR SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES WHICH [TULLEY] MAY INCUR OR EXPERIENCE ON ACCOUNT OF

ENTERING INTO OR RELYING ON THIS AGREEMENT, EVEN IF
[CDK] HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH
DAMAGES.

(Defs. Ex. M at CDK000011–12.)

CDK argues that it complied with its contractual obligations and used
more than reasonable efforts to try to remedy Tulley's issues with Drive. CDK
also argues that this provision bars any "incidental or consequential" damages
Tulley has incurred.

"In New Jersey, parties to a contract may agree to limit their liability as
long as the limitation does not violate public policy." *Prof'l Cleaning &
Innovative Bldg. Servs., Inc. v. Kennedy Funding, Inc.*, 245 F. App'x 161, 167 (3d
Cir. 2007) (citing *Mayfair Fabrics v. Henley*, 48 N.J. 483, 487, 226 A.2d 602
(1967)). However, "[t]he law is well-settled that fraud, be it common law or
statutory, provides a basis for rescinding a contract." *Id.* at 167–68 (citing *First
Am. Title Ins. Co. v. Lawson,* 177 N.J. 125, 136, 827 A.2d 230 (2003);
Restatement (Second) Contracts § 164 ("If a party's manifestation of assent is
induced by either a fraudulent or a material misrepresentation by the other
party upon which the recipient is justified in relying, the contract is voidable by
the recipient.")). Thus, if a jury finds that Tulley was deceived into entering the
contract by CDK's misrepresentations, CDK cannot "rely on the protection of
the limitation of liability provisions contained in the [contract]." *Id.* (citing
*Wärtsilä NSD North Am. Inc. v. Hill Int'l Inc.,* 342 F.Supp.2d 267, 289, 290
(D.N.J.2004)). Because I have denied CDK summary judgment on Tulley's
NJCFA claim, I will deny summary judgment based on the limitation of liability
clause found in the MSA.[15]

That is not to say, however, that the limitation of liability clause is
without effect. New Jersey courts will uphold such clauses if they are not

---

[15]  In my prior opinion on the motion to dismiss (DE 103), I dismissed the claim
of rescission, but only on the grounds that it was superfluous. Rescission, I held, is
more properly viewed as a remedy where fraud is found, rather than an independent
cause of action.

unconscionable or in violation of public policy. *Lucier v. Williams*, 841 A.2d 907, 911 (N.J. Super. Ct. App. Div. 2004). The standard for unconscionability is "lack of honesty in fact, good faith, and fair dealing." *Doe v. Bank of Am., N.A.*, No. CV 16-3075, 2018 WL 295565, at *8 (D.N.J. Jan. 3, 2018) (internal citation omitted). In order to determine whether a limitation in liability clause is unconscionable, courts will consider the following factors: the adhesive nature of the contract, the subject matter of the contract, the parties' relative bargaining positions, the economic compulsion motivating the adhering party, and any public interest that might be affected by the contract. *Id.*

Based on the factors above, I find that the limitation on liability clause in the MSA is enforceable. The MSA was not one of adhesion, as Tulley had the ability to negotiate the provisions contained within it and there is no evidence that Tulley was in a weaker bargaining position than CDK. Moreover, both parties were sophisticated business entities and were in a position to fully understand all the provisions within the MSA. Because "[a] party who enters into a contract in writing, without any fraud or imposition being practiced upon him, is conclusively presumed to understand and assent to its terms and legal effect[,]" I find that Tulley's damages would be limited pursuant to the limitation of liability clause found in the MSA. *See Prescription Counter v. AmerisourceBergen Corp.*, No. CIV A 04-5802 SRC, 2007 WL 3511301, at *11 (D.N.J. Nov. 14, 2007) (citing *Rudbart v. North Jersey Dist. Water Supply Comm'n*, 127 N.J. 344, 353 (1992)). That would especially be true if, for example, CDK were found liable for breach of contract but not for fraud under the NJCFA.

### g. Tulley's Counterclaim 5: Unjust Enrichment; CDK's Claim 3: Attorney's Fees

CDK also moves for summary judgment on Tulley's unjust enrichment claims. A claim for unjust enrichment is commonly asserted as an alternative to a breach of contract claim. *Palmeri v. LG Elects. USA, Inc.* 2008 WL 2945985, at *7 (D.N.J. July 30, 2008). I will permit it remain in the case on that basis.

41

Finally, I will deny Tulley's motion for summary judgment on CDK's claim for contractual attorney's fees. The issue remains open because CDK's breach of contract claim remains in the case.

## IV.    Conclusion

For the reasons set forth above, I will grant CDK's motions for summary judgment on Tulley's common law fraud counterclaim (Counterclaim 1), but otherwise deny their motion for summary judgment on other claims; deny Tulley's motion for summary judgment on CDK's claims; and grant CDK's motion to voluntarily dismiss the replevin and conversion counts against Tulley.

An appropriate order follows.

Dated: September 25, 2020

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**