<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CDK GLOBAL, LLC, as successor-in-interest to ADP DEALER SERVICES, INC., | Civ. Action No. 15-3103 (SDW) (JBC) |
| Plaintiff, | **TRIAL OPINION** |
| v. | |
| TULLEY AUTOMOTIVE GROUP, INC., AND JOHN DOE CORPORATIONS 1-5, | August 16, 2024 |
| Defendants. | |

**WIGENTON**, District Judge.

This Court held a bench trial for five days in this matter regarding Plaintiff CDK Global, LLC's ("CDK") claims for breach of contract and contractual attorneys' fees against Defendant Tulley Automotive Group, Inc. ("Tulley") and Tulley's counterclaims for breach of contract, unjust enrichment, and violation of the New Jersey Consumer Fraud Act ("NJCFA") against CDK. Pursuant to 28 U.S.C. §§ 1332 and 1391, this Court has jurisdiction over the matter and venue is proper. Based on the testimony and evidence presented at trial, this Trial Opinion constitutes this Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure ("Rule") 52(a). For the reasons stated below, this Court finds that Tulley is not liable to CDK for breach of contract, and CDK is not liable to Tulley for breach of contract, unjust enrichment, and violation of the New Jersey Consumer Fraud Act (NJCFA).

**I.    <u>PROCEDURAL HISTORY</u>**

On May 1, 2015, CDK, as successor-in-interest to ADP Dealer Services, Inc. ("ADP"), filed this lawsuit asserting claims for breach of contract, contractual attorneys' fees, replevin, and

conversion.[1]  (D.E. 1.)  Tulley answered CDK's Complaint and brought five counterclaims against CDK:  breach of contract, fraudulent inducement, rescission,[2] violation of the New Jersey Consumer Fraud Act ("NJCFA"), § 56:8-1 *et seq.*, and unjust enrichment.  (D.E. 16, 22.)

On September 25, 2020, Judge McNulty, now on senior inactive status, issued his rulings on the parties' Motions for Summary Judgment, dismissing Tulley's claims of fraudulent inducement and CDK's claims of replevin and conversion.  (D.E. 310–11.)  This case was reassigned to this Court on November 29, 2023.  On April 15, 2024, this Court held a Daubert hearing and granted CDK's *in limine* Motion to exclude the report and testimony of Tulley's damages expert, Jane Copeland.  (D.E. 386, 388.)

After summary judgment, CDK's remaining claims are breach of contract and contractual attorneys' fees, and Tulley's remaining counterclaims are breach of contract, unjust enrichment, and violation of NJCFA, § 56:8-1 *et seq*.  This Court held a five-day bench trial from June 3, 2024 to June 7, 2024.  (D.E. 400, 402–05.)

## II.     FINDINGS OF FACT[3]

This Court, writing primarily for the parties, makes the following findings of fact.

CDK is a provider of "subscription-based software and technology solutions" for retailers

---

[1] For simplicity, references to CDK will be deemed to include the predecessor ADP entity.

[2] On April 29, 2016, Judge McNulty, now on senior inactive status, dismissed Tulley's rescission claim in his opinion for CDK's Motion to Dismiss.  (D.E. 103.)

[3] References to trial exhibits are to Plaintiff's Exhibits and Defendant's Exhibits.  References to trial transcripts, (D.E. 408–12), identify the witness, volume (*e.g.*, "T1"), and page: line.

T1 = Trial Transcript dated June 3, 2024.  (D.E. 408.)
T2 = Trial Transcript dated June 4, 2024.  (D.E. 409.)
T3 = Trial Transcript dated June 5, 2024.  (D.E. 410.)
T4 = Trial Transcript dated June 6, 2024.  (D.E. 411.)
T5 = Trial Transcript dated June 7, 2024.  (D.E. 412.)
PX = Plaintiff's Exhibit.
DX = Defendant's Exhibit.

and manufacturers of a variety of vehicles, boats, and equipment for construction and agriculture across different industries, including automobile dealerships. (DX-2 at 4–5.) One of the products CDK sells is a Dealer Management System ("DMS") called "Drive," which is a computer software program that supports its customers' daily business operations, including sales, consumer financing, repair and maintenance orders, inventory, payroll, and accounting. (*Id.*; DX-1 at 6.)

Tulley is a car dealership located in Manchester and Nashua, New Hampshire. (*See* B. Tulley, T3, 467:22–24.) Tulley is a family business owned and controlled by Bryan Tulley, Jack Tulley, Mark Tulley, and Vince Tulley. (M. Tulley, T2, 291:2–11, 296:2–12.) In 2012, CDK began negotiating with Tulley about replacing its DMS with Drive. (*See id.* at 301:24–305:6.) At that time, Tulley was using a different DMS called Arkona[4] and had no prior relationship with CDK. (*See id.* at 300:25–301:4; B. Tulley, T3, 522:2–5.) The parties did not reach an agreement in 2012. (*See* B. Tulley, T3, 522:9–13.)

In about March or April 2013, CDK and Tulley resumed discussions about switching to Drive. (*See* PX-283 at TULLEY0003235.0005.) In May and June 2013, Jeff Evans, a CDK sales representative, met with John Murphy, Tulley's general manager, and Bryan Tulley at the Nashua dealership. (B. Tulley, T3, 478:20–479:2; J. Murphy, T4, 602:7–13.) During the meeting, Jeff Evans represented that: Drive was capable of serving Tulley's business needs; Drive would improve Tulley's efficiency and profitability; the transition from Arkona to Drive would be seamless; and Drive would integrate with Tulley's preexisting software programs. (*See* B. Tulley, T3, 477:18–478:9; J. Murphy, T4, 603:20–604:13.)

After some negotiations, particularly on the upfront and monthly costs, (*see* M. Tulley, T2, 306:24–307:1, 308:4–309:5), the parties executed a Master Services Agreement ("MSA") on June

---

[4] Arkona is also referred to as "Dealertrack" in the trial record.

3

26, 2013.  (PX-1 at CDK0000028.)  The MSA consists of the main agreement plus its schedules and addenda.  (*See id.* ¶ 1.)

Under the MSA, Tulley agreed to lease software from CDK for a term of five years and pay a start-up fee and monthly fees to CDK during that term.  (*See generally* PX-1.)  On the other hand, CDK agreed to install Drive for Tulley.  (*Id.* ¶ 1.)  In addition, CDK promised that its software would meet its "functional and technical specifications" and agreed to provide support services "to keep [its software] operating in good working order."  (*Id.* ¶¶ 5, 12.)

The MSA also includes an integration clause, provisions that limit CDK's liabilities and define CDK's remedies upon Tulley's default, and a provision that states that there are no express or implied warranties with respect to CDK's services and software, and that Tulley did not rely on any representation or warranty not contained in the Agreement.  (*Id.* ¶¶ 12–17.)  In the event of a breach, Tulley's sole remedy is for CDK to "use reasonable efforts to correct any Service or Software which is not in compliance with [CDK's warranty] . . . ."  (*Id.* ¶ 13.)

In August 2013, CDK began the training and implementation process to prepare Tulley for the transition to and launch of Drive.  (*See* P. Mari, T1, 28:8–29:15; PX-33.)  Although CDK and Tulley dispute how much training Tulley's employees completed prior to Drive's launch, (*see* P. Mari, T1, 57:11–20), Tulley was not contractually required to complete pre-launch training under the MSA.  Rather, the training was recommended by CDK to make the transition to Drive easier.  (*See id.* at 39:7–14; T. McCoy, T1, 79:16–80:5.)  CDK would have turned on Drive for Tulley as scheduled regardless of whether Tulley's employees had completed enough training.  (P. Mari, T1, 58:2–7.)

Before Drive went "live," Tulley confirmed and verified that CDK had set up and configured Drive as Tulley preferred, in accordance with the information Tulley provided.  (*See*

R. Herbert, T2, 220:6–222:11; 226:21–227:20; 231:7–235:8; PX-81 at CDK007658–61, CDK008866–68; PX-79 at CDK004755–56.)  Drive went "live" on December 3, 2013.  (M. Tulley, T3, 457:11–12.)

Soon after Drive launched, Tulley began experiencing a myriad of issues, including functions related to sales, inventory management, customer service, pricing for parts, payroll, and financial reporting, which it communicated to CDK.  (*See* J. Murphy, T4, 607:11–608:10; DX-48; DX-52; DX-54; DX-98; DX-116; DX-119; DX-120; DX-123.)  In response, CDK tried to address Tulley's issues by providing free additional training and system adjustments on-site and had internal discussions with their own consultants and account managers.  (*See* R. Herbert, T2, 251:14–19; PX-186; PX-195; PX-208; PX-213.)

When the parties executed the contract, the Nashua dealership had three franchises on site: BMW, GMC, and Mazda.  (B. Tulley, T3, 471:20–22.)  In May 2014, CDK internally concluded that the primary cause of Tulley's DMS issues was that Tulley only had one set of logons for the Nashua dealership and not a separate set of logons for each franchise at that location and identified this as a "sales" issue.  (*See* DX-257 at 2; DX-140 at 3.)  In June 2014, CDK formally proposed to provide two additional sets of logons for the Nashua location and reconfigure Tulley's Drive system.  (*See* T. McCoy, T1, 95:4–13; 109:18–111:13; PX-208.)

While CDK claims that its multi-logon solution would be free, there is no supportive evidence to that effect.  Instead, trial evidence showed that CDK never communicated to Tulley whether the extra logons and the subsequent reconfiguration of Drive would be free of charge.  (*See* T. McCoy, T1, 143:17–20; B. Tulley, T3, 501:8–14.)  Internally, CDK acknowledged that the proposal requires a "new install[ation]" of Drive, (DX-258), and it would be a "[huge] scope of work."  (T. McCoy, T1, 108:9–109:10, 139:10–140:5.)  Tulley did not accept CDK's proposal,

5

(M. Tulley, T3, 435:4–6), and continued to experience issues with Drive through the first quarter of 2015. (*Id.* at 503:11–19.)

On September 10, 2014, Tulley's attorney sent a letter to CDK ("Rescission Letter") stating that "[t]his letter is [a] notice of rescission of the Master Agreement" and that Tulley "will not be paying any further contract fees and will be moving to a new service system provider within ninety (90) days of the date of this letter." (PX-263 at CDK021341.) Subsequently, CDK and Tulley had a meeting at the Nashua dealership on December 16, 2014. (PX-280 at TULLEY0005942.0001.) After the meeting, CDK proposed in writing a list of action items to improve Tulley's experience with Drive on January 9, 2015. (*Id.*)

On or about April 1, 2015, Tulley resumed using Arkona, but continued to make timely monthly payments to CDK. (*See* B. Tulley, T3, 503:14–504:4, 504:25–506:2.) At around the same time, Tulley turned off its GM RIM program—a software program used to manage parts inventory—because Tulley could not simultaneously run Arkona and GM RIM. (J. Murphy, T5, 795:20–22.) GM RIM was one of many software applications in addition to Drive that Tulley purchased from CDK. (*Id.* at 795:18–796:1; M. Tulley, T3, 447:13–23.)

CDK's attorneys sent Tulley letters on March 31, 2015 and April 1, 2015, seeking a formal termination notice, which Tulley never provided. (*See* B. Tulley, T3, 506:8–17; DX-73.) In response, Tulley's lawyers wrote to CDK's counsel on April 6, 2015, stating that Tulley "has not terminated its contract with CDK and has continued to make payment under the [MSA]." (DX-73 at CDK014928.)

CDK filed the instant suit against Tulley on May 1, 2015. (D.E 1). Tulley made its last monthly payment on May 12, 2015. (B. Tulley, T3, 508:9–20; DX-78 at TULLEY0003072.0001.) On May 13, 2015, CDK asked Tulley to provide a termination date and thirty days' notice for the

final cessation of services and informed Tulley that if it did not provide a termination date by May 19, 2015, CDK would choose a termination date for Tulley.  (*See* DX-80.)  On May 26, 2015, CDK terminated Tulley's access to Drive.  (J. Murphy, T5, 755:23–756:6.)

### III.   CONCLUSIONS OF LAW

#### A. CDK's Claims for Breach of Contract and Contractual Attorneys' Fees

The MSA is governed by New Jersey law.  *See CDK Glob., LLC v. Tulley Auto. Grp., Inc.*, 489 F. Supp. 3d 282, 299 (D.N.J. 2020).  Relevant to both parties' breach of contract claim, the MSA is a valid and enforceable contract.  The MSA was not one of adhesion, as Tulley negotiated some of the provisions (*e.g.*, price) therein, and there is no evidence that Tulley was in a weaker bargaining position than CDK.  (*See* M. Tulley, T2, 306:24–307:1, 308:4–309:5.)

Under New Jersey law, to prevail on a breach of contract claim, a plaintiff must prove four elements:  (1) "the parties entered into a contract containing certain terms"; (2) "plaintiffs did what the contract required them to do"; (3) "defendants did not do what the contract required them to do, defined as a breach of the contract"; (4) "defendants' breach, or failure to do what the contract required, caused a loss to the plaintiffs."  *Goldfarb v. Solimine*, 245 A.3d 570, 577 (N.J. 2021) (citation and internal quotation marks omitted).

CDK argues that Tulley breached the MSA when it:  (i) began using Arkona while it was still paying for Drive, (ii) disconnected its GM RIM program, and (iii) authorized its attorney to send a notice of rescission of the MSA on September 10, 2014.  This Court will address each of these arguments in turn.

##### i.   Tulley switched to Arkona while it continued to pay for Drive

First, Tulley's decision to revert to Arkona while it continued to pay for Drive every month was not a breach of the MSA because Tulley was not contractually required to exclusively use

7

Drive to operate its business.

The MSA's purpose is for Tulley to acquire the software licenses, equipment, and maintenance services related to the operation of Drive.[5] For example, Section One of the MSA, which defines the scope of the contract, provides that "[CDK] agrees to provide [Tulley] and [Tulley] agrees to obtain from [CDK]" services, software licenses, software support services, equipment, and equipment maintenance as described in the Schedules. (PX 1 ¶ 1.) The Schedules, which describes the services CDK was required to provide to Tulley, states that: "[Tulley] agrees to purchase and/or license from [CDK] and [CDK] agrees to sell license, and/or provide, the Equipment, Software, On-Line Services and/or other Services listed below in accordance with the terms and conditions of the MSA. (*Id.* at CDK000029, CDK000038.) The MSA's language indicates that, at its core, the contract's purpose is to provide software and services in exchange for payments. Tulley's usage of Arkona did not interfere or frustrate this purpose. Nothing in the MSA prohibits Tulley from using another DMS at the same time as Drive.

Trial testimony corroborates that the parties did not believe that the MSA required exclusivity in Tulley's choice of DMS. Mark Tulley testified at trial that his understanding of what the MSA includes, in general terms, is "hardware and software." (M. Tulley, T4, 485:2–6.) On the other hand, CDK presented no evidence at trial that Tulley was contractually obligated to use Drive exclusively or that it was deprived of any benefit of the bargain while Tulley used Arkona and paid for Drive at the same time.

In sum, Tulley's decision to use Arkona while it continued to pay for Drive was not a breach.

---

[5] In his September 25, 2020 opinion, Judge McNulty stated that "[r]eading the MSA's various provisions together as a whole, it is clear that the purpose of the MSA was for CDK to lease its DMS software to Tulley, and to provide maintenance services for the rented software and equipment should any issues arise, for a term of five years." *CDK Glob.*, 489 F. Supp. 3d at 299.

    ii.  <u>Tulley disconnected GM RIM</u>

  Second, Tulley did not breach the MSA by disconnecting GM RIM from its DMS system.

  Starting with the MSA's texts, not a single provision requires Tulley to keep GM RIM connected to its DMS system, and CDK did not present any evidence to the contrary at trial. "In the interpretation of a contract, the court's goal is to ascertain the intention of the parties as revealed not only by the language used but also with reference to the surrounding circumstances and the relationships of the parties at the time it was entered into." *Caro on behalf of Ltd. Liab. Co. v. Perez*, No. A-2210-15T3, 2017 WL 2730255, at *5 (N.J. Super. Ct. App. Div. June 26, 2017) (citing *Driscoll Constr. Co., Inc. v. N.J. Dep't of Transp.*, 853 A.2d 270, 278 (N.J. Super. Ct. App. Div. 2004)).

  GM RIM was not part of the "core package" that Tulley negotiated for. (*See* PX-1 at CDK0000017.) The MSA provides that "the Application Programs listed under the Drive Conn or WS Conn" are known as "Core Bundle." (*Id.* at CDK000029, CDK000038.) Specifically, the "Schedule to Master Service Agreement" for the Nashua location[6] lists over twenty programs under "Core Package." (*Id.* at CDK000017.) These core programs include, but are not limited to, accounting, accounts payable, payroll, parts inventory and invoicing, and purchase orders. (*Id.*) GM RIM is not one of the core programs Tulley paid for under the contract. Instead, it is tellingly listed under "Other Dealershipwide Options" in the MSA. (*Id.* at CDK000019.)

  Trial testimony supports the inference drawn from the MSA's language that GM RIM was an ancillary feature. Mark Tulley testified that during the parties' negotiation, CDK offered to replace Arkona with "core" ADP products for an upfront fee of $103,000 and a monthly fee of $10,900, and that he counter-offered $90,000 upfront and $10,900 per month for all the core

---

[6] Only the Nashua location sells and provide services on GM vehicles.

9

programs plus "the CRM, Web Desk, and one additional Micron printer for checks/payroll." (M. Tulley, T2, at 307:21–309:5; PX-255 at 1–2.) GM RIM was never mentioned in the parties' negotiations.

In addition, the cost of GM RIM is minimal in comparison with the total upfront and monthly fees Tulley agreed to pay. According to the MSA's Schedule for Nashua, the upfront fee and recurring monthly fee for the entire contract were $91,944.77 and $10,141.95, respectively. (PX-1 at CDK000020.) In contrast, the upfront installation fee and the monthly fee of GM RIM were $412.50 and $91.00, respectively. (*Id.* at CDK000019.) The value of GM RIM to CDK was minimal, if not negligible, compared to the value of the entire contract.

Based on the foregoing evidence, the disconnection of GM RIM was not a breach of the MSA.

        iii.    <u>Recission Letter</u>

Third, Tulley's September 2014 Recission Letter was not a breach of contract. While the letter states that Tulley "will not be paying any further contract fees . . . within ninety (90) days of the date of this letter," Tulley continued to perform as required by the MSA, making timely and full payments to CDK until May 2015 when CDK disabled Tulley's access to Drive and took the equipment. (M. Tulley, T3, 437:12–19, 459:22–24; DX-78 at TULLEY0003072.0001.) In fact, Tulley made its last monthly payment on May 12, 2015—eleven days after CDK filed this suit. (*Id.* at 508:9–20.)

CDK also argues that the letter was an anticipatory repudiation. Under New Jersey law, a repudiating party can retract his repudiation "by any method" before his next performance is due unless the aggrieved party has cancelled the contract or materially changed his position. N.J.S.A. 12A:2-611. Therefore, even assuming CDK's argument has merit, Tulley's continued

10

performance of making timely payments and CDK's continued acceptance of those payments demonstrate a mutual affirmance of the contract by conduct.

In any event, no trial evidence showed that CDK believed that the Rescission Letter terminated the MSA. Representatives from both sides had a meeting at Tulley's headquarters in Nashua on December 16, 2014—three months after Tulley sent the letter. (PX-280 at TULLEY0005942.0001.) After the meeting, CDK proposed in writing a list of action items to improve Tulley's experience with Drive on January 9, 2015. (*Id.*) These facts show that the parties were actively engaged in finding solutions for Tulley as opposed to walking away from their contractual obligations or believing that the MSA was terminated.

Further, Tulley's attorney wrote to CDK's counsel on April 6, 2015, stating that Tulley "has not terminated its contract with CDK and has continued to make payment under the [MSA]." (DX-73 at CDK014928.) On May 13, 2015, CDK's attorney sent a letter to John Murphy asking for a termination date and stating that if the requested notice was not received by May 19, 2015, CDK will choose a termination date for Tulley. (*See* DX-80.) Drive was still running at the time. (J. Murphy, T4, 615:22–24.) Under these circumstances, CDK could not have reasonably believed that Tulley had terminated the contract and still asked Tulley for a termination date.

In sum, CDK has not proven by a preponderance of the evidence that Tulley breached the MSA.[7]

### B. Tulley's Breach of Contract Counterclaim

Tulley argues that CDK breached the MSA by failing to sell and install a functional Drive system. CDK, however, is not liable for breach of contract.

As required by the MSA, CDK provided Tulley with services, software programs, software

---

[7] Because CDK has not proven its breach of contract claim, its claim for contractual attorneys' fees will be dismissed.

11

support services, equipment, and maintenance for the operation of Drive. (*See* PX ¶¶ 1–17.) CDK also warranted that its software programs "will conform to their respective functional and technical specifications" and that its equipment "will be in good working order." (*Id.* ¶ 12.) CDK met its warranty obligations, also. (*See e.g.*, R. Herbert, T2, 247:6–16 (describing Drive's strengths in creating reports).)

In addition, CDK's obligation in the event of a breach was to "use reasonable efforts to correct any Service and Software" not in compliance with the warranties. (PX ¶ 13.) CDK used reasonable efforts to address Tulley's issues through onsite adjustments and trainings, and internal discussions with its own employees and consultants. (*See e.g.*, R. Herbert, T2, 210:7–18, 213:6–23, 220:10–221:8, 225:22–226:13, 231:7–233:13, 251:14–25, 273:21–25; PX-186; PX-213; PX-237.) Even assuming CDK committed a breach by not setting up a multi-logon system for Tulley from the outset, CDK offered and was able to install additional logons for Tulley, which would have resolved most of Tulley's issues. (*See* T. McCoy, T1, 92:16–18; DX-257.) In other words, Drive and its supporting software and equipment were capable of serving Tulley's needs. CDK was prepared to implement effective solutions for Tulley, who did not accept CDK's proposal. (*Id.* at 139:10–20.)

This Court, however, finds that CDK breached the contract when it picked up the DMS equipment from Tulley and discontinued Tulley's connection to Drive before the end of its five-year term in May 2015. Nevertheless, Tulley's breach of contract counterclaim fails because it has not proven that it suffered damages.

Bryan Tulley testified at trial that Tulley had to hire additional employees, such as a greeter, to cope with issues caused by Drive and that those issues negatively impacted its employee morale, reputation, and customers' experiences. (B. Tulley, T3, 504:5–22; B. Tulley, T4, 585:2–12.)

12

Tulley, however, presented no evidence as to the cost of hiring additional employees, their dates of employment, or any method to ascertain damages flowing from Drive's negative impact on employee morale, reputation, or customers' experiences.

Tulley also seeks to recover damages for the money it paid to settle a case in which Wells Fargo Financial Leasing, Inc. ("Wells Fargo") sued Tulley in New Hampshire for breach of contract, alleging that Tulley defaulted on a lease agreement for CDK's DMS equipment. *See Wells Fargo Fin. Leasing, Inc. v. Tulley Auto. Grp., Inc.*, No. 16-218 (D.N.H. 2016).

Tulley's argument is meritless. The equipment lease in the *Wells Fargo* case was a separate and different contract from the MSA. *See Wells Fargo*, 2016 WL 5660290, at *1 (D.N.H. Sept. 29, 2016) (finding that Tulley had to execute an equipment lease agreement, in addition to the MSA, to "obtain the computer networking equipment" from ADP). In addition, CDK was not a party[8] to the *Wells Fargo* case; Wells Fargo acquired ADP's rights under the equipment lease and sued Tulley. *Id.* CDK was also not a party to Tulley's settlement with Wells Fargo. (*See* DX-86.) Tulley has presented no argument as to why it could not have litigated the merits of that case in court. Therefore, the *Wells Fargo* case does nothing to prove that CDK caused Tulley ascertainable damages.

In sum, Tulley failed to prove damages "with enough specificity to be considered quantifiable or measurable." *CDK Glob., LLC*, 489 F. Supp. 3d at 311. For the reasons stated above, Tulley has not proven its breach of contract counterclaim.

**C. Tulley's NJCFA Claim**

Tulley also argues that CDK is liable for violating the NJCFA. The NJCFA, however, does not apply if CDK did not engage in the sale or advertisement of "merchandise." *All the Way*

---

[8] The District of New Hampshire granted CDK's motion to dismiss Tulley's third-party complaint and dismissed CDK from the suit on September 1, 2017. *See Wells Fargo*, 2017 WL 3841840, at *4.

13

*Towing, LLC v. Bucks Cnty. Int'l, Inc.*, 200 A.3d 398, 404 (N.J. 2019).  The NJCFA defines "merchandise" as including "any objects, wares, goods, commodities, services or anything offered, directly or indirectly to the public for sale."  N.J.S.A. 56:8–1(c).  One issue at trial was whether the Drive system is merchandise under the NJCFA.  If so, then the NJCFA applies here.

      i.      <u>Whether Drive is "merchandise" within the protection of the NJCFA</u>

In *All the Way Towing*, the New Jersey Supreme Court announced four factors to determine whether "business-to-business transactions" can fit within the NJCFA's definition of "merchandise":

> (1) the complexity of the transaction, taking into account any negotiation, bidding, or request for proposals process; (2) the identity and sophistication of the parties, which includes whether the parties received legal or expert assistance in the development or execution of the transaction; (3) the nature of the relationship between the parties and whether there was any relevant underlying understanding or prior transactions between the parties; and, as previously noted; (4) the public availability of the subject merchandise.

*All the Way Towing*, 200 A.3d at 408.  Having considered the testimony and evidence presented at trial, this Court concludes that Drive is merchandise under the NJCFA.

First, the transaction was not too complex to be covered by the NJCFA.  The parties negotiated for about three months, from March to June 2013, primarily on price, before they executed the contract.  (*See* M. Tulley, T2, at 306:24–309:5; PX-255 at 1–2; PX-283 at TULLEY0003235.0005.)  Tulley also did not issue any request for proposal for a new DMS.  (B. Tulley, 3T, 487:4–6.)  Second, even though Tulley is a successful dealership business, that alone does not demonstrate that Tulley was a sophisticated consumer in this particular transaction about DMS.  *See Hundred E. Credit Corp. v. Eric Shuster Corp.*, 515 A.2d 246, 249 (N.J. Super. Ct. App. Div. 1986) ("Even the most world-wise business entity can be inexperienced and uninformed in a given consumer transaction.")  Tulley had no specialized knowledge of DMS systems and did not receive any assistance from an attorney or a computer consultant during the negotiation and

14

execution of the MSA. (B. Tulley, T3, 485:7–22; J. Murphy, T4, 601:25–602:2.) Third, the parties had no relationship prior to their negotiation of the MSA in 2013. (B. Tulley, T3, 474:14–16.)

Lastly, Drive is available to not only dealerships but also a variety of clientele across different industries. (*See* DX-1 at 6; DX-2 at 4; DX-4 at 1–2.) While one cannot walk into a store and purchase Drive off the shelves, courts have found that products suited to the needs of a limited clientele base can still be considered goods that are available to the public. *See Prescription Counter v. AmerisourceBergen Corp.*, No. 04-5802, 2007 WL 3511301, at *16 (D.N.J. Nov. 14, 2007); *Hundred E. Credit Corp.*, 515 A.2d at 248 (holding that the NJCFA applies to the sale of computer technology for use in business operations and that "a business entity can be, and frequently is, a consumer in the ordinary meaning of that term").

The Appellate Division held that the sale of a computer "system consisting of hardware and custom programmed software for billing, accounts receivable and inventory control" was within the scope of the NJCFA. *Dreier Co., Inc. v. Unitronix Corp.*, 527 A.2d 875, 877 (N.J. Super. Ct. App. Div. 1986) (internal quotation marks omitted). Like Tulley, the plaintiff company in *Drier* was "just as vulnerable to unconscionable business practices as a private consumer," *id.* at 882, as it "had no knowledge or expertise in the computer field and therefore relied upon [the defendants] to provide a system to meet plaintiff's particular needs." *Id.* at 877. Mark Tulley testified that "[Tulley] relied on CDK's sales reps because they were the professionals." (M. Tulley, T2, 314:7.) The fact that Drive was intended to be used in Tulley's business operations is not dispositive on the question of its availability.

In sum, the *All the Way* factors weigh in favor of finding that Drive is merchandise within the protection of the NJCFA. The NJCFA applies here.

     ii.  <u>Elements of the NJCFA</u>

To prevail on a violation of the NJCFA claim, a party must prove three elements: (1) "unlawful conduct by defendant"; (2) "an ascertainable loss by plaintiff"; and (3) "a causal connection between the unlawful conduct and the ascertainable loss." *Bosland v. Warnock Dodge, Inc.*, 964 A.2d 741, 749 (N.J. 2009) (citations omitted)). After summary judgment, factual issues material to the first and second elements remained to be resolved at trial. After weighing the testimony and evidence presented at trial, this Court finds that Tulley has not proven the NJCFA's first and second elements.

As discussed previously, Tulley has not set forth sufficient evidence to prove damages in this case. Therefore, Tulley fails to meet the damages element of a NJCFA claim.

As to the first element, Tulley argues that Jeff Evans made misrepresentations about Drive when he visited Tulley in May 2013. (*See* B. Tulley, T3, 477:11–478:9, 491:20–492:2; J. Murphy, T4, 603:17–604:19.) The NJCFA distinguishes between actionable misrepresentations of fact and "puffery." *See Rodio v. Smith*, 587 A.2d 621, 624 (N.J. 1991) (the slogan "You're in good hands with Allstate" was "nothing more than puffery" and was thus not "a deception, false promise, misrepresentation, or any other unlawful practice within the ambit of the [NJCFA]"). "Puffery is distinguishable from misdescriptions or false representations of specific characteristics of a product," and "[a]s such, it is not actionable." *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 945 (3d Cir. 1993). "The distinguishing characteristics of puffery are vague, highly subjective claims as opposed to specific, detailed factual assertions." *In re Toshiba America HD DVD Marketing and Sales Practices Litigation*, No. 08-939, 2009 WL 2940081, at *10 (D.N.J. Sept. 11, 2009) (citation omitted).

Any statements that Drive would save Tulley time and money, would make Tulley more profitable or efficient, and would reduce complexity, are subjective generalities about the future. *See e.g., Lukacs v. Purvi Padia Design LLC*, No. 21-19599, 2022 WL 2116868, at *6 (D.N.J. June 13, 2022) (holding that defendant's representation "that all of the [interior design] work would be of high[-]quality craftsmanship" was not actionable under the NJCFA) (alteration omitted); *N.J. Citizen Action v. Schering–Plough Corp.*, 842 A.2d 174, 177 (N.J. Super. App. Div. 2003) (finding that defendant's advertisements which employed phrases such as "you . . . can lead a normal nearly symptom-free life again" were "not statements of fact, but are merely expressions in the nature of puffery and thus are not actionable" under the NJCFA).

As to Jeff Evans' representations that Drive would be able to "plug in additional services," (B. Tulley, T3, 477:11–478:9), namely, two customer relationship management programs called FirstLook and Dealersocket, they were not misrepresentations. "An affirmative misrepresentation under the [NJCFA] is one which is material to the transaction and which is a statement of fact, found to be false, made to induce the buyer to make the purchase." *Cold Star Sales & Leasing, Inc. v. TRU Aseptics, LLC*, No. 19-14030, 2020 WL 1910334, at *6 (D.N.J. Apr. 17, 2020) (citation omitted). Mark Tulley testified that FirstLook did integrate with Drive, at least for a period of time, and that he did not expect CDK's software to integrate with Tulley's preexisting programs after he switched from Arkona to Drive. (M. Tulley, T2, 387:7–12, 390:9–13; 393:1–3.)

Therefore, after considering all of the evidence, this Court finds that CDK did not engage in unlawful conduct. Tulley has failed to prove its NJCFA claim.

**Tulley's Unjust Enrichment Claim**

"Unjust enrichment is not an independent theory of liability, [sic] but is the basis for a claim of quasi-contractual liability." *MK Strategies, LLC v. Ann Taylor Stores Corp.*, 567 F. Supp.

2d 729, 733 (D.N.J. 2008) (citation omitted).  A plaintiff may recover from unjust enrichment claims only "where an express contract cannot be proven." *Gallo v. PHH Mortg. Corp.*, 916 F. Supp. 2d 537, 553 (D.N.J. 2012) (citation omitted).

Here, Tulley's unjust enrichment counterclaim arises from the same conduct as its breach of contract counterclaim.  Based on the evidence presented at trial, this Court finds that the MSA was a valid and enforceable contract executed after the parties engaged in arms-length negotiations.  *See* Section III.A., *supra*.  Therefore, Tulley cannot recover under unjust enrichment, and the counterclaim must be dismissed.

### IV.   CONCLUSION

For the reasons set forth above, this Court finds that Tulley is not liable to CDK for breach of contract, and CDK is not liable to Tulley for breach of contract, unjust enrichment, and violation of the NJCFA.  Neither party has a cause for action in this matter.  An appropriate order follows.

      /s/ Susan D. Wigenton
    **SUSAN D. WIGENTON, U.S.D.J.**

Orig:  Clerk
cc:    James B. Clark, U.S.M.J.
       Parties